## HALLIBURTON-ABBOTT CO. v. HODGE.

No. 25191.   April 2, 1935.

Rehearing Denied May 7, 1935.

Ramsey, deMeules, Martin & Logan, for plaintiff in error.

Biddison, Campbell & Biddison and Harry Campbell, Jr., for defendant in error.

PHELPS, J. The plaintiff, Daisy Hodge, sued the Halliburton-Abbott Company, a corporation operating a department store in Tulsa, to recover damages on account of false imprisonment. The jury returned a verdict for plaintiff for $1,000 actual damages and $3,000 exemplary damages. Upon consideration of defendant's motion for new trial, the court ordered that a new trial should be had unless plaintiff should remit half of the punitive damages, whereupon plaintiff filed her remittitur of $1,500. Judgment was then rendered for $1,000 actual damages and $1,500 punitive damages, motion for new trial was overruled, and defendant appeals.

The facts are rather extensive. A mercantile detective agency by the name of Willmark Service System, Inc., operates out of New York and contracts with large retail stores over the entire country to check the faithfulness, efficiency, and honesty of the store clerks. The Willmark Service System, Inc., had such a contract with the defendant's business affiliate, Sears, Roebuck & Company, which it appears owns or has an interest in the defendant's store.

A crew of four representatives of the Willmark Service System, Inc., visited Tulsa and stopped at the same hotel. Two of this crew were women described as "professional shoppers." Separately these women visited the defendant's store and made purchases of merchandise from the plaintiff, who was working there as an extra clerk during a sale. Plaintiff in each instance placed the merchandise in a paper sack and returned the shopper her change, and the usual merchandise ticket was placed in the sack with the merchandise. Then the shoppers bought picture cords and paid plaintiff the exact purchase price, making it unnecessary for plaintiff to return them any change. On these latter purchases the shoppers observed that plaintiff did not furnish them with any merchandise tickets.

Then the shoppers, in each instance, returned to the hotel and reported the transaction to the crew manager, Mr. Gunther, and his assistant, Mr. Dreher, making penciled notation of the transaction on the back of the purchase slip. Mr. Gunther then inspected the cash register at the store, and also the carbon sheets in the plaintiff's sales book, and found no evidence of the plaintiff's having recorded the sales of the picture cords. It appears from the evidence that one general cash register was used in that department and that there was a rush on, and that 20 or 30 girls were using this machine at the same time. They had three or four keys and appliances to push and pull and plaintiff had not been instructed concerning the use of this machine. She testified that on one of her sales earlier that morning she had made a sale of 30 cents, but had "rung it up" as $30, and that some confusion was encountered in clearing the mistake. It is unnecessary to further narrate this portion of the case, due to the important fact that during the trial the defendant's attorney stated:

"We haven't said, and I expressly advised counsel during the trial of this case, that we did not claim that Miss Hodge stole any money from Halliburton-Abbott Company. * * * We have never charged her with it, and we do not now."

A few hours after the sale the plaintiff was told by the defendant's floor manager that Mr. Kay, the superintendent of the Halliburton-Abbott Company store, desired to see her in his office on the fifth floor. She did not know Mr. Kay nor just which was his office. She went to the fifth floor and at a desk she saw a girl, to whom she said, "I am Miss Hodge." The girl, pointing, replied. "In there." Plaintiff then walked in

the door, closed it and found an irregularly shaped room. She walked around a corner and there noticed two men, whom she had never before seen. (It later developed that these were Gunther and Dreher of the Willmark Service System, Inc. Mr. Kay was not in the room.) Plaintiff addressed Gunther, saying. "Mr. Kay? I am Miss Hodge." The strange man said, "Sit down", plaintiff took her seat on the opposite side of the table and for a while there was silence, but suddenly Gunther opened a drawer, pulled out a package, and slamming it on the table so that the merchandise which she had sold to one of the women shoppers flew out of it and into her lap, inquired, "Did you ever see that before?" Plaintiff told him that she had and that she had sold it. Gunther then repeated the same acts and words in connection with the other package of merchandise. He then stated that she had not accounted for the money. She vehemently denied having taken it, and offered to let him search her, and told him where her good shoes and pocket book were, in the dressing room, and suggested that he search those. A prolonged conversation ensued, in which (plaintiff testified) Gunther became very angry, screaming loudly at her, and repeatedly directing Dreher to "go see if those men have come"; that this happened at least five times, and Dreher would leave the room and return shortly without making any reply. Gunther would also say to Dreher, "See if those men have come and bring in those affidavits." When plaintiff asked him what men were coming, he replied, "You will find out what men are coming when they get here." It appears that these were affidavits which they desired plaintiff to sign, admitting her guilt, which she denied. Gunther said, "If you had been decent about it and acknowledged this, we would have been easy on you * * * you haven't been, and now we are going to fix you." Gunther kept opening a drawer and "pushing those things", presumably push buttons, and the plaintiff was generally impressed that policemen were coming for her. Finally the plaintiff said "I am leaving here," to which Gunther replied, **"You are not, sit down."** This continued for some while, and plaintiff testified that she was afraid to try to leave the room and that she feared if she did leave it would only make it more hopeless if the two policemen, whom she was expecting, took hold of her and marched her out of the store. She was in the room about 30 minutes. Finally she conceived the idea of running away when Dreher should next leave the room. This she did. When she emerged from the room, crying, the girl at the desk said to her, "Those damn fools, what have they done?", and this girl directed her to Mr. Kay, the defendant's superintendent. It serves no purpose to here detail the condition thus produced in plaintiff, who could not leave the store for more than an hour thereafter, and who continued in a hysterical condition until in the night, causing her throat to swell and making it impossible for her to breathe except through artificial manipulation thereof.

When she became closeted with Mr. Kay he resumed the cross-examination which Gunther had carried on in the other room. Mr. Kay, however, later became more conciliatory in his attitude and asked plaintiff if she would say that she had punched the wrong number on the machine, to which she replied: "I wouldn't say for sure I did, because I don't know how, I don't know where the money went. All I know, I don't have it and I told them I didn't have it." Eventually plaintiff was led down the five flights of stairs by another employee, and left the store. She testified that the effect on her was such that when she went to work in other stores she was in such constant fear of making a mistake that she was unable to hold a job. At one of these places they took her off sales work and put her to making boxes, in an effort to steady her nerves, but she was unable to go on with sales work.

The defendant's first proposition is that: "Taking as true all the evidence introduced in plaintiff's behalf, there is no proof of a false imprisonment, and this record is wholly lacking in proof of any detention of plaintiff against her will." From the authorities quoted we gather the impression that defendant urges the absence of physical restraint, and the relationship of employer and employee, as excusing it from the charge of false imprisonment. Defendant points out that plaintiff could have left the room at any time by simply walking out.

There is no evidence that any one physically restrained the plaintiff. But her testimony, coupled with the physical facts, was sufficient to submit to the jury the issue as to whether the threats and all the circumstances induced within plaintiff a reasonable belief that an attempt to escape would be futile. She further testified that this fear was increased by her belief that if she

should leave the store she would encounter the two policemen whom she thought were coming, and that, being in a comparatively strange town, without friends, she would have to spend the night in jail before she could explain the situation, and that she would rather die than go to jail.

It has become elementary law that, in order to constitute false imprisonment, physical restraint is not necessary; if the words and conduct of Gunther and Dreher induced in the plaintiff a reasonable belief that resistance or physical attempts to escape the room or store would have been useless and futile, then it is nevertheless false imprisonment, regardless of the absence of physical restraint. This matter was submitted to the jury under proper instructions. All of the persons participating in the episode were present and testified before the jury, describing the events and the physical facts in the case, and we cannot say that the jury was unauthorized from the evidence to find as it did.

We observe that the defendant's affiliate, Sears, Roebuck & Company and the Willmark Service System, Inc., have recently encountered difficulty in the use of the same system in the state of Nebraska, as reported in Dillon v. Sears, Roebuck & Co. et al., 253 N. W. 331, in which the Supreme Court of that state used the following language:

"Is the evidence upon false imprisonment sufficient to support the verdict? The essential thing to constitute an imprisonment is restraint of the person, which may be by threats as well as by actual force, and if the words and conduct are such as to induce a reasonable apprehension or fear of force, of disaster, or disgrace, a person may be as effectually restrained and deprived of liberty as by prison walls."

Again we find the Willmark Service System, Inc., in virtually the same situation in the state of Virginia, as reported in W. T. Grant Co. v. Owens, 141 S. E. 860, from which decision we quote:

"We deem it sufficient to say that, while Maroney and Eales, or either of them, would have been justified in detaining the plaintiff for a reasonable time, in a reasonable way, for the purpose of having her explain the circumstances reported by Miss Geiger, neither of them was justified in detaining her with the bullying tactics and threats detailed by her, in an attempt to prove her guilt, or to make her confess that she intended to take the 50 cents in question. Such restraint was unlawful, and constitutes a false imprisonment in law, and, if the jury believed her testimony, it had a right to so find."

We are of the same opinion as the Nebraska and Virginia courts in announcing our approval of a verdict condemning such practices as we find reflected in this record. There is a clear distinction between a lawful and orderly interrogation of or interview with an employee, to investigate that employee's suspected irregularity, and the browbeating, third-degree inquisition made use of in the present case. The guilt or innocence of the plaintiff is not material. The defendant does not claim she was guilty. If she was guilty, then our Criminal Code prescribes a lawful manner of dealing with the situation; it was not for the defendant or any private detective in its employ to take over the administration of our criminal laws and the functions of the county attorney.

As excusing it from liability the defendant further asserts that Gunther and Dreher, who committed the acts of which plaintiff complains, were the employees of Willmark Service System, Inc., an independent contractor, and that thus defendant is not liable for the acts of employees of said independent contractor. The relationship between defendant and Willmark Service System, Inc., was created by written contract wherein the latter agreed to visit the store three times during the term of the contract and check up sales people therein as to their efficiency and faithfulness, and to report to the defendant the result of said inspection. In said contract the Willmark Service System, Inc., agreed to indemnify the store to the extent of one-half of any judgment which might be recovered against the store under certain conditions. The following language was embodied in the contract:

"It is expressly understood and agreed that the questioning of female salespeople in any of your stores shall be entirely optional with us. Wherever and whenever we do not deem it judicious to question a female salesperson, the facts of any irregularity committed by such female salesperson will be submitted to either your store manager or direct to you at your main office, as you may prefer. Where we deem it judicious to question a female salesperson, however, the foregoing indemnity clause, with all conditions contained therein, shall also apply to such cases,"

The weight of authority seems to be that one may not employ or contract with a special agent or detective to ferret out the irregularities of his employees and then escape liability for malicious prosecution or false arrest on the ground that the agent is an independent contractor: Clinchfield Coal

Corporation v. Redd (Va.) 96 S. E. 836; Annotation 77 A. L. R. 932; Adams v. F. W. Woolworth Co., 257 N. Y. S. 776; Komorowski v. The Boston Store, 262 Ill. App. 88. But in addition to the foregoing we have here an apt illustration of the principle that a joint tort-feasor cannot escape liability merely because the other joint tort-feasor was an independent contractor. The floor manager, who directed the plaintiff to the fifth floor with the instruction that Mr. Kay (store superintendent) desired to see her, thereby brought the store into the commission of this offense. Mr. Kay himself, in continuing the conduct of Gunther and Dreher, thereby lent his aid in a manner evidencing the store's participation in the false imprisonment, which occurred on the store's property and during and as a part of plaintiff's employment. We have an exactly parallel case in W. T. Grant Company v. Owens, supra, wherein the crew manager of Willmark Service System, Inc., was one Eales and wherein, said the court:

"The uncontradicted evidence shows that Maroney, the defendant's general manager of the Norfolk store, expressly turned plaintiff over to Eales for the purpose of having him investigate the alleged irregularity and in order that he (Maroney) might act upon the result of the investigation as he saw fit. He also delivered to Eales the original and duplicate sales tickets and other data in his possession, and Eales was in consultation with Maroney from time to time throughout the proceedings. * * * With respect to this particular undertaking, Eales was a special agent of the defendant, even though he was employed by Willmark Service System, and that concern may have been an independent contractor under its contract with the defendant."

The following is an excerpt from Adams v. F. W. Woolworth Co., 257 N. Y. S. 776, and expresses our opinion:

"Immunity from vicarious liability would permit any store keeper to subject his customers to the hazards of an irresponsible detective agency without peril to himself. He would obtain all the benefit of the surveillance and punishment of shoplifters; he would be subject to none of the penalties for unjustified or unlawful arrests of law-abiding citizens. The opportunities for gross injustice afforded by such a doctrine are too manifest to permit its incorporation into the jurisprudence of our state, without compelling reason."

About 13 days before the trial of this case the plaintiff served a three-day notice upon the defendant that she would present an amendment to her petition, seeking the recovery of punitive or exemplary damages, which amendment alleged no new facts, but alleged that the acts done and committed were willful, malicious, and grossly oppressive. Three days thereafter the amendment was submitted to the court and the defendant objected. The court permitted the amendment and allowed defendant five days to file its answer thereto. Defendant contends that it was error for the court to refuse it the opportunity to plead to the amendment **other** than by answering.

In the answer which was filed by the defendant there was included an allegation that the amendment failed to state facts entitling plaintiff to relief. We are unable to discover how the defendant was injured by the court's ruling. The amendment could not have been made more definite and certain; no parts of it would have been subject to a motion to strike, and it would have been impossible for plaintiff to have alleged more facts evidencing maliciousness and oppression than were contained in the plain and concise statements of the original petition. Defendant cannot complain that its right to demur was thereby denied, because it did demur in its answer, and could have objected to the introduction of evidence in the trial of the case, which would have presented to the court the same question as a demurrer would have presented. The amendment served only to put defendant on notice that plaintiff would ask exemplary damages. The allegations of fact contained in the original petition were such that, if true, would present a situation of malice and oppression. In other words, the acts alleged necessarily included malice and oppression. The essence of false imprisonment is oppression. Thus no issues of fact were changed by the amendment. We therefore conclude that the trial court committed no abuse of discretion. Dixon v. Helena Society of Free M. E. Church of North America, 65 Okla. 203, 166 P. 114.

The defendant next argues that the damages awarded are so excessive as to indicate that the verdict was the result of passion and prejudice, and that therefore the defendant did not have a fair trial. With this contention we do not agree. We have examined many cases wherein the gist of the action was false imprisonment, with an eye on the amount of damages awarded. We find them ranging from $100 up to $10,000; in many of them the exemplary damages were considerably in excess of the actual damages awarded. The amount depends

upon the facts in the particular case, with especial regard to the relationship of the parties, the means and mode of the unlawful detention, the amount of suffering, humiliation and disgrace thereby caused, as well as the actual damages sustained, the period of detention, and any other proper facts or elements present. There are few more horrifying experiences than that of being suddenly snatched from a peaceful and orderly existence and placed in the helpless situation of having one's liberty restrained, under the accusation of a crime. Particularly is this true in the present case, where the party was an inexperienced woman in a comparatively strange town, with few if any friends, and already suffering from a nervous ailment. Both from a consideration of the merits of the case and from a comparison with the amount of verdicts in analogous cases, we are unable to conclude that the amount of damages awarded is so excessive as to indicate that the verdict was arrived at as a result of passion and prejudice.

The defendant complains that it was error for the court to refuse an instruction to the effect that in all cases damages must be reasonable; and cites section 10001, O. S. 1931, to the effect that "damages must, in all cases, be reasonable. * * *" We find that the court sufficiently covered this point in its instruction No. 6 to the effect that "* * * you will fix the amount of plaintiff's recovery at such a sum of money as under the evidence will fairly and reasonably compensate her. * * *"

Defendant's next assignment of error is that "Plaintiff wholly failed to prove any actual damages for which she could recover compensation, and was, therefore, not entitled to recover either actual or punitive damages." In support of that assignment the defendant cites negligence cases involving personal physical injury. Such cases are not applicable to false imprisonment. It is true that mental pain and suffering, standing alone, do not ordinarily constitute sufficient basis for the recovery of substantial damages. But we think exceptions to this rule are recognized in such actions as breach of contract of marriage and willful wrong affecting the liberty, personal security, character, or reputation of an individual. Further, mental pain and suffering, as such, must be distinguished from pain and suffering resulting from an injury to the nervous system, which is to be regarded as a physical injury and, as such, sufficient in itself to support a recovery of damages. 17 C. J. 831.

In C., R. I. & P. Ry. Co. v. Radford, 36 Okla. 657, 129 P. 834, we state:

"We know of no case, and counsel has not attempted to cite any, where in an action to recover damages for false arrest, it was held necessary to prove, in addition to mental suffering, a physical injury, before a recovery would be authorized."

Of course there must be an actionable wrong before there can be an allowance of punitive damages, but, in order to authorize punitive damages, mere nominal damages are sufficient. The frequency of reported cases wherein the amount of punitive damages greatly exceeds the amount of actual damages serves to illustrate the purpose of punitive damages, that purpose being to punish defendant and to deter others from commission of the same wrong, rather than as compensation to the plaintiff.

Finding no prejudicial error in the record, the judgment is affirmed.

McNEILL, C. J., and RILEY, BUSBY, and GIBSON, JJ., concur.