S. H. KRESS & CO. v. BRADSHAW.

*99 P. 2d 508.*

No. 28991. Feb. 6, 1940.

Rehearing Denied Feb. 27, 1940.

McKeever, Stewart & McKeever, of Enid, for plaintiff in error.

Otjen & Carter, of Enid, for defendant in error.

BAYLESS, C. J. Frances Bradshaw sued S. H. Kress & Co., a corporation, in the district court of Garfield county, Okla., to recover compensatory damages. In her petition, in a first cause of action based upon alleged false imprisonment, she claimed damages in amount of $1,500, and in a second cause of action based upon alleged personal injuries, she claimed damages in amount of $1,400. The jury returned a verdict finding generally in her favor, and in relation to the first cause of action fixing the amount of her recovery at $1,500, and in relation to the second cause of action fixing the amount of recovery at $300. Judgment was rendered on the verdict, and the defendant has appealed.

From the evidence, as same relates to the first cause of action, the following is made to appear: On May 21, 1937, at about 12:30 noon, Mrs. Frances Bradshaw, a resident of Enid, Okla., made a purchase of postage stamps at the post office in that city, and in the transaction received as part of the change due her a certain half dollar. From the post office, and accompanied by her five-year-old daughter, she proceeded to the defendant's store in Enid, intent upon there purchasing some work sox for her husband. In making the purchase, which came to the amount of 41 cents, she tendered to Miss Reinwald, the defendant's clerk there waiting upon her, the half dollar which she had received over at the post office. Miss Reinwald, from sounding the half dollar on a marble slab attached to the cash register, became of the belief that said coin might be counterfeit. She did not, however, inform Mrs. Bradshaw of this belief; but under the pretext of having to procure change in order to complete the sale transaction absented herself from the presence of Mrs. Bradshaw and carried the half dollar to the store's office, which was located on a balcony in the rear of the store room, leaving Mrs. Bradshaw in waiting at the counter where the merchandise had been selected. Upon reaching the office Miss Reinwald turned the half dollar over to another of the defendant's employees, a Miss Glenn, who then held the position of assistant cashier in the store. There Miss Glenn made certain tests of the half dollar, from which she became convinced said coin was counterfeit. Miss Glenn thereupon proceeded to call the city police station by telephone, and advised the desk sergeant then on duty at the station that the Kress store "had a bad half dollar," and that, "if they cared to, to send a man over." Upon receiving this call from Miss Glenn the desk sergeant directed a uniformed city policeman, Officer Bennell, to forthwith proceed to the store; and the distance from the police station to the store being only 50 or 60 feet, Bennell arrived at the store very shortly after Miss Glenn's call came into the station. He had proceeded

from the police station to the store along an alley, and he entered the store through one of the doorways in the rear of the building. Miss Reinwald, it appears, after turning the half dollar over to Miss Glenn in the office, was informed by Miss Glenn that the half dollar was counterfeit. Whereupon Miss Reinwald immediately returned to the counter where Mrs. Bradshaw had remained in waiting and there proceeded to engage Mrs. Bradshaw in casual conversation. Bennell, upon entering the store, was approached by Miss Glenn, who there handed to him the half dollar in question and pointed in the direction where Mrs. Bradshaw and Miss Reinwald were standing at the hosiery counter. Miss Glenn was in the act of leaving the store, to go out for lunch, at the time she met the policeman, and after handing him the coin she immediately departed from the store.

With respect to occurrences subsequent to Bennell's arrival at the store, Mrs. Bradshaw testified that she "noticed a policeman coming in at the back door"; that he first approached some one in the store, and then walked up to where she was standing, and said to her: "Lady, where did you get that fifty-cent piece?"; and that she said: "At the post office"; that the policeman then said to her: "Are you sure you got it at the post office?"; that she replied, "I certainly am"; that he then said to her, "You come and tell that to the desk sergeant"; that she was afraid to resist him; that she suggested, "Let's ride in the car", and explained to the officer that her car was parked "out in front"; that the officer said: "No, let's go out this way", meaning "out the back door." Bennell testified that, upon entering the store at the rear, he "stood there and one of the girls brought the money to me"; that he didn't remember which of the girls it was; that he "had some instructions that there was some counterfeit money over there and she handed it to me and I looked at it and there was some chips in it and it looked very similar to some we had gotten before and I looked at it and the lady that had passed it walked up there." That he

said to Mrs. Bradshaw, "It looks like counterfeit to me all right"; and further, "we will go over to the police station and see what the sergeant says, and if you remember where you got it, we will get your money back for you"; and, "I started out the back door and she followed me out." Bennell also testified that while in the store on this occasion none of the store employees or clerks asked him to take Mrs. Bradshaw out of the store, or said anything other or further to him than that to which he testified.

Mrs. Bradshaw, her small daughter, and Bennell left the store together, departing therefrom through a doorway in the rear. And Bennell proceeded with Mrs. Bradshaw and the little girl along the alley to the police station. At the police station she was interrogated by the desk sergeant concerning the source from which she had come into possession of the half dollar in question. In this connection, Bennell testified: "I throwed the half dollar on the desk and he looked at it and he had several others in the drawer and he pulled them out and compared them and dropped them on the desk and they sounded exactly alike, and he asked her if she remembered where she got it, and she said she got it in change at the post office. And he asked her if she wanted to go over with me to get her money and she said 'yes', and I went over to the post office and got her money for the half dollar." Mrs. Bradshaw testified, however, that it was at the suggestion of a police matron who was present that she was taken over to the post office. Bennell further testified that after they had left the store, and either on the way to the police station or at the station, the following occurred: "She made the statement that she was excited and nervous and trying to do right, and never had been arrested, and I told her we were not arresting her, that it was our duty to help people the same as anything else, and we would try to help her."

At the post office, the postal clerk from whom Mrs. Bradshaw had made the purchase of stamps was interviewed by Bennell in the presence of Mrs. Brad-

shaw, and the clerk readily remembered that Mrs. Bradshaw had that day made a purchase of stamps from him. Bennell testified that upon arriving at the post office with Mrs. Bradshaw, the following occurred: "I throwed the half dollar in the window and asked (the clerk) if he remembered giving the lady the half dollar in change and he said, 'Yes, I did'"; that "He (the clerk) took the half and looked at it and dropped it down on the metal plate in the window and said, 'That half dollar is all right,' and throwed it in the drawer and picked out another half and throwed it out." At the conclusion of the interview Mrs. Bradshaw and Bennell left the post office together, and upon reaching the street Mrs. Bradshaw was released from further custody.

It was further disclosed by the evidence that the defendant had previously issued written instructions to its employees, on the subject of counterfeit money, as follows:

"Check the money received from customers to determine counterfeit money, coin and bills. If in doubt whether a coin or bill is good refer it to the manager, or authorized person on the floor. This may be done on the excuse of securing change, as the customer might otherwise be offended."

And Mr. W. L. Casselman, local manager of the defendant's store in Enid at the time Mrs. Bradshaw made the purchase aforementioned, and also holding that position at the time of the trial in the court below, testified that he was not in or about the store at or during the time Mrs. Bradshaw was there; but he had previously instructed clerks and employees of the store, "that whenever counterfeit coins were handed them or detected on their registers to call the police."

False imprisonment, it is said in 25 C. J. 443, sec. 1, "consists in the unlawful restraint against his will of an individual's personal liberty or freedom of locomotion." And in 22 Am. Jur. 353, sec. 2, the following appears:

"False imprisonment has been said to be the unlawful restraint by one person

of the physical liberty of another. In this phrase the word 'false' seems to be exactly synonymous with 'unlawful.' * * * The following comprehensive definition is given by the American Law Institute: 'An act which directly or indirectly, is a legal cause of confinement of another within boundaries fixed by the actor for any time, no matter how short in duration, makes the actor liable to the other irrespective of whether harm is caused to any legally protected interest of the other, if the act is intended to confine the other or a third person, and the other is conscious of the confinement, and the confinement is not otherwise privileged.' "

With respect to the detention of Mrs. Bradshaw in the defendant's store up to the time Miss Glenn, the defendant's employee, became convinced the half dollar was counterfeit, it properly may be said that the proof adduced at the trial warrants no conclusion other than that Mrs. Bradshaw was not at the time conscious of the fact that she was being intentionally detained. The fact that she had tendered in payment for merchandise selected by her from the defendant's stock a half dollar which Miss Reinwald, the defendant's clerk, then believed to be counterfeit, undoubtedly warranted and justified her detention in the store for a reasonable time thereafter in order that the defendant's clerks and employees who had interested themselves in the matter might become satisfied as to the genuineness of the coin in question. Otherwise they might have been placed in the position of permitting their employer's merchandise to be exchanged for a coin proving to be counterfeit. In 11 R. C. L. 805, sec. 18, we find the statement that:

"* * * The right of defense of one's person and property may sometimes require and justify the restraint of any person who seeks to interfere with and injure them."

And in Collyer v. S. H. Kress & Co. (Cal.) 54 P. 2d 20, it was held that:

"Ordinarily, the owner of property in exercise of his inherent right to protect it may restrain another who seeks to interfere with or injure it."

Other cases recognizing or reflecting

the principle are: Mackie v. Ambassador Hotel, etc., Corp., 123 Cal. App. 215, 221, 11 P. 2d 3; Jacques v. Childs Dining Hall Co., 244 Mass. 438, 138 N. E. 843, 26 A. L. R. 1329; Fenn v. Kroger Grocery & Baking Co. (Mo.) 209 S. W. 885; Sweeney v. F. W. Woolworth Co., 247 Mass. 277, 142 N. E. 50, 31 A. L. R. 311; Atchison, T. & S. F. Ry. Co. v. Hinsdell, 76 Kan. 74, 90 P. 800, 12 L. R. A. (N. S.) 94, 13 Ann. Cas. 981; Bettolo v. Safeway Stores, Inc. (Cal. App.) 54 P. 2d 24; Foulke v. New York Consol. Ry. Co., 228 N. Y. 269, 127 N. E. 237, 9 A. L. R. 1384. In Jacques v. Childs, etc., supra, it was held:

"The proprietor of a restaurant may detain a patron, who apparently has not paid for food purchased, a reasonable time to investigate the circumstances."

It does not appear that Mrs. Bradshaw has complained to the effect that her detention was for an unreasonable length of time. And since she was not at the time conscious of an intentional detention, and the right to protect the defendant's property having intervened, we are of the opinion the detention of Mrs. Bradshaw in the defendant's store was not unlawful up to the time Miss Glenn became convinced through tests made by her that the half dollar in question was counterfeit.

With respect to further detention, Mrs. Bradshaw alleged in her petition that:

"* * * She had been detained and restrained at said store by agents of said defendant * * * and on the arrival of the policeman, * * * said agents and employees caused this plaintiff to be arrested without cause."

"* * * At the instance of defendant's agents, * * * plaintiff was taken by the policeman to the police station * * * and subjected to detention there. * * * The policeman * * * took plaintiff to the post office. * * *"

"* * * Plaintiff was taken into the custody of the policeman, who was the agent of defendant, without warrant and without authority at the instance and request of defendant through its employees; * * * that said arrest greatly frightened plaintiff and humiliated her * * * and her reputation and standing in the community greatly damaged. * * * That said arrest and shock caused plaintiff nervous illness, injured her reputation and standing," etc.

In 22 Am. Jur. 354, sec. 3, it is said that "false arrest and false imprisonment as causes of action are indistinguishable. The only distinction lies in the manner in which they arise." In Hepworth v. Covey Bros., etc. (Utah) 91 P. 2d 507, the following may be noted:

"False arrest may be committed only by one who has legal authority to arrest. False imprisonment may be committed by any one who imprisons without legal right. One who commits a false arrest of another may be liable in damages for false imprisonment, but from this we must not reason that if there is a failure of proof of false arrest, of necessity there is a failure of proof of false imprisonment. False arrest is merely one means of committing a false imprisonment. False imprisonment may be committed without any thought of attempting an arrest."

See, also, Fox v. McCurnin (Iowa) 218 N. W. 499, wherein it was held:

"Where plaintiff in action for false imprisonment was driven from apartment house in which he had rooms by owner, and under direction of owner was placed under arrest, whereupon he brought action against owner alleging false arrest and false imprisonment, held, that they were not distinguishable, and therefore charge amounted only to charge of false imprisonment, and did not state distinct causes of action, in view of Code 1924, sec. 13465, defining arrest, and section 13468, providing occasions upon which police officer may make an arrest."

In 22 Am. Jur. 356, sec. 4, the following statement appears:

"The primary right involved in an action for false imprisonment is the liberty of the citizen, or, in other words, the right of freedom of locomotion, the right to come and go or stay when or where one may choose. * * * The constituent elements of a cause of action for false imprisonment, as seen from the definition and essential elements of the tort, as distinguished from other similar wrongs, are (1) the detention or re-

straint of one against his will, and (2) the unlawfulness of such detention or restraint. It is not necessary that the wrongful act which results in detention or restraint be under color or any legal or judicial proceeding, nor do lack of malice, the presence of good faith, or the presence of probable cause for the imprisonment affect the existence of the wrong when the detention is unlawful. There need be no actual force, threats, or injury done to the individual's person, character, or reputation."

False imprisonment may be accomplished without actual arrest, assault, or imprisonment, and may be committed by words alone or by acts alone, or by both. Harris & Co. v. Caldwell (Tex. Civ. App.) 276 S. W. 298; Riley v. Stone (N. C.) 94 S. E. 434; Newton v. Rhodes Bros. (Tex.) 24 S. W. 2d 378.

In the instant case there was proof on the part of Mrs. Bradshaw going to establish that she was taken into custody by Bennell, a policeman, without warrant, and required against her will to proceed under that custody to places other than where she wished to go.

The following statement appears in the brief (p. 26) of the plaintiff in error:

"As shown by the evidence the plaintiff was not arrested as there was no intention on the part of the clerks or the police officer to arrest the plaintiff but merely an intention to investigate for the purpose of tracing the counterfeit coin, but had she been arrested the defendant and the police officer would have been justified."

It will be remembered that Mrs. Bradshaw testified that while standing in the defendant's store she "noticed a policeman coming in at the back door," and that in the course of her conversation which he there had with her, he said to her: "You come and go tell that to the desk sergeant." Hence, in effect, as much as to say: "I am a police officer, as you know, and what I am now doing and commanding you to do is by legal authority." From Mrs. Bradshaw's testimony it may fairly and reasonably be inferred that the policeman's appearance and his acts and words tended to create in Mrs. Bradshaw's mind the belief of a necessity of conforming to the demands thus made upon her or suffer the consequences, and that she conformed rather than chance the consequences, and thereby was restrained of her liberty. So, whether she was arrested or not, the restraint was just as effective. Hepworth v. Covey Bros., etc., supra.

In the brief of plaintiff in error no authority is cited as sustaining or supporting the right or authority of Bennell as an officer or otherwise to take Mrs. Bradshaw into custody and further detain her while such investigation as is referred to in the statement quoted above was being carried on. In section 2780, Okla. St. 1931 (22 Okla. St. Ann. § 196), it is provided that a peace officer may, without a warrant, arrest a person:

"(1) For a public offense, committed or attempted in his presence.

"(2) When the person arrested has committed a felony, although not in his presence.

"(3) Where a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it.

"(4) On a charge, made upon reasonable cause, of the commission of a felony by the party arrested."

Section 2783, Id. (22 Okla. St. Ann. § 199), provides:

"When arresting a person without a warrant, the officer must inform him of his authority and the cause of the arrest, except when he is in actual commission of a public offense, or is pursued immediately after an escape."

And section 2765, Id. (22 Okla. St. Ann. § 181), provides:

"The defendant must in all cases be taken before the magistrate without unnecessary delay."

Section 2138, Id. (21 Okla. St. Ann. § 1591), provides:

"Every person who has in his possession any counterfeit of any gold or silver coin, whether of the United States or any foreign country or government, knowing the same to be counterfeit, with intent to sell or use, circulate or export the same,

as true or as false, or by causing the same to be uttered or passed, is guilty of forgery in the second degree."

Considering that, according to Mrs. Bradshaw's testimony, Bennell said to her: "You come and go tell that to the desk sergeant"; and also that, according to Bennell's testimony, he told her while in the store: "We will go over to the police station and see what the sergeant says, and if you remember where you got it we will get your money back for you"; and, further, that he told her, after they had departed from the store, he was not "arresting" her, we think it may be said that no conclusion may fairly and reasonably be drawn other than that Bennell was not in the matter of taking Mrs. Bradshaw into custody proceeding by virtue of any provision of, or authority contained in, section 2780, supra.

In connection with the detention of Mrs. Bradshaw which ensued from the time Miss Glenn became convinced that the half dollar in question was counterfeit, it is to be remembered the evidence disclosed that Mr. Casselman had previously instructed the clerks and employees "to call the police" in instances wherein counterfeit coins were tendered to said clerks or employees: that the evidence also disclosed that Miss Glenn, after completing tests which she made on the questioned half dollar while Miss Reinwald was with her in the office, there advised Miss Reinwald that said half dollar was counterfeit; that thereupon Miss Reinwald left the office and returned to the hosiery counter where she had left Mrs. Bradshaw in waiting for her change; that Miss Reinwald, upon returning to the hosiery counter, made no tender of change nor explanation for not so doing, but proceeded to engage Mrs. Bradshaw in casual conversation. From this evidence it may fairly and reasonably be inferred that Mrs. Bradshaw was then and there being intentionally and purposely detained pending arrival of an officer. It is also to be kept in mind that the evidence disclosed the telephone call to the police station as being made by Miss Glenn, after she had become convinced that the half dollar was counterfeit; that

upon arrival of Bennell, the officer, Miss Glenn approached him while he yet was in the rear of the store, handed the half dollar to him and pointed in the direction where Mrs. Bradshaw was standing; that Bennell, as heretofore stated, then accosted Mrs. Bradshaw, and after conversing with her took her into custody and proceeded with her to the police station.

A well-established principle of law is that all who by direct act or indirect procurement personally participate in, or proximately cause, the false imprisonment or unlawful detention of another are liable therefor. 22 Am. Jur. 371, § 31; 25 C. J. 497, § 69; Halliburton-Abbott Co. v. Hodge, 172 Okla. 175, 44 P. 2d 122. And as to each participant, the law is unconcerned with the extent or degree of his activity when it comes to consider the question of liability, and places all on the same footing, each equally liable, jointly and severally. And this is true, regardless of whether a conspiracy to do the act theretofore had been entered into. 22 Am. Jur. 371, § 30; 25 C. J. 497, § 69; Meints v. Huntington, 276 Fed. 245, 19 A. L. R. 644.

In the court below, and with respect to each cause of action, the defendant demurred to the plaintiff's evidence, subsequently renewed same and also moved for a directed verdict. The trial judge overruled the demurrer and also refused to direct a verdict. And in this appeal these adverse rulings are assigned as error.

As we view and consider the evidence adduced on the part of Mrs. Bradshaw, same tends to show that, on the occasion of her appearance at the defendant's store, referred to in her petition and in the testimony, she was restrained of her liberty under circumstances from which the presumption would follow in law that the restraint effected was not lawful; and further, said evidence and the inferences fairly and reasonably arising therefrom tended to show employees of the defendant as having contributed to said restraint. The evidence, in our opinion, sufficiently made out as against the de-

fendant a prima facie case of unlawful restraint or detention. See 22 Am. Jur. 422, § 107; 25 C. J. 538, § 146, Fox v. Mc-Curnin (Iowa) 218 N. W. 499; Smith v. Clark (Utah) 106 P. 653, 26 L. R. A. (N. S.) 953, Ann. Cas. 1912B, 1366. In Smith v. Clark, supra, it was said that:

"* * * When by proof of facts or circumstances tending to show that the plaintiff was restrained or detained or imprisoned by the defendant, without warrant, or other process or by threats or force, or other facts or circumstances which naturally give rise to the inference or presumption that the restraint or imprisonment was wrongful or unlawful, he undoubtedly has made a prima facie case. The duty of proceeding to show a legal justification for such restraint, detention, or imprisonment then rests upon the defendant. * * *"

With respect to the demurrer to the evidence, so far as same was directed against the evidence adduced on Mrs. Bradshaw's part in making out a prima facie case of unlawful restraint and detention, we hold said demurrer to be without merit.

In her petition, in stating her second cause of action, Mrs. Bradshaw alleged in part the following:

"* * * Agents of defendant named herein detained and restrained * * * plaintiff until the officer arrived and then * * * W. L. Casselman, the manager of the store, or Mable Reinwald or other agents of defendant to plaintiff unknown opened a door in the rear of the store not intended for entrance or departure from said store and directed or caused the policeman, Bennell, who was the agent of defendant, to take this plaintiff out said door. * * * That plaintiff, over her protest, was arrested by the policeman and taken out of this rear door. This door was elevated nearly three feet above the alley and was not intended for egress or entrance to the store, but the agents and manager of defendant caused the policeman to compel the plaintiff to jump from the floor to the alley. * * * This jump seriously and permanently injured this plaintiff and caused a miscarriage. Said jump caused shock and injury to her nervous system and injured her back so that she has suffered pain and nerv-

ousness since said jump and has been permanently injured thereby. * * *"

From the foregoing allegations it would appear that the claim of damages asserted under the second cause of action is based, not upon the fact of Mrs. Bradshaw having been unlawfully detained and restrained of her liberty, but upon the alleged fact that she was compelled to "jump from the floor to the alley," and that the "jump" resulted in alleged injuries to her, in that it "caused a miscarriage," caused "shock and injury to her nervous system," and "injured her back so that she has suffered pain and nervousness since said jump and has been permanently injured thereby."

There was not, however, as we read the record, any evidence adduced on the part of Mrs. Bradshaw which either directly or inferentially tended to support the allegation that clerks or employees of the defendant "directed and caused" the policeman to use a rear doorway in taking her out of the store; and the same also applies with respect to the further allegation that "the agents and manager of defendant caused the policeman to compel the plaintiff to jump from the floor to the alley." Evidence tending to support these allegations being essential in order to establish in the second cause of action a right of recovery as against the defendant, and there being no such evidence, we are of the opinion the trial court should have sustained the demurrer to the evidence, so far as said demurrer related to the second cause of action.

The plaintiff in error complains of certain instructions which were given in connection with the first cause of action, and also complains of the refusal on the part of the trial judge to give therein certain requested instructions. The instructions given in connection with the first cause of action, when considered together and in their entirety, appear as fairly and reasonably presenting the issues and applicable law in the case. And we are of the opinion, that neither the giving of the instructions complained of nor the refusal to give the requested in-

structions constitutes reversible error.

The judgment on the first cause of action is hereby affirmed. But said judgment, on the second cause of action, is hereby reversed, and the cause is remanded to the trial court, with directions to dismiss said second cause of action.

Affirmed in part; reversed in part, and remanded with directions.

CORN, GIBSON, HURST, DAVISON, and DANNER, JJ., concur. RILEY, J., concurs in part and dissents in part. WELCH, V. C. J., dissents. OSBORN, J., absent.