STANLEY HERBRICK, APPELLEE, v. SAMARDICK & COMPANY, A PARTNERSHIP, ET AL., APPELLANTS.

101 N. W. 2d 488

Filed March 4, 1960. No. 34659.

834

*Gross, Welch, Vinardi & Kauffman,* for appellants.

*Sheldon J. Harris,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

Stanley Herbrick brought this action in the district court for Douglas County as plaintiff against Samardick & Company, a partnership, and Lewis & Smith Drug Co., Inc., a corporation, for damages for false arrest and imprisonment. The case was tried to a jury resulting in a verdict for the plaintiff in the amount of $1,250, and judgment was entered thereon. Motions to set aside the verdict and judgment, and for judgment in accordance with the motion for directed verdict or, in

the alternative, motions for new trial were overruled. The defendants appealed.

The plaintiff's petition alleged in substance that while in the defendant Lewis & Smith Drug Company store and not finding the items which he desired to purchase, the plaintiff left the store and was detained by a woman who was a store detective employed by the defendant Samardick & Company for the purpose of watching for shoplifters, acting within the scope of her employment; that the plaintiff was taken by the detective to the office of Lewis & Smith Drug Company and then and there accused of stealing pills from the drug store; that the plaintiff was detained by employees of the drug store and the detective for approximately 1½ hours during which time the plaintiff denied taking said pills; that said employees and detective would not release the plaintiff, and threatened him with imprisonment unless he would sign a release; that after said period of time the plaintiff was allowed to leave the store; and that said arrest and imprisonment by the defendants was without cause and as a result thereof plaintiff suffered shame, humiliation, disgrace, and mental anguish by reason of which he suffered damages. The prayer of the petition was for damages against the defendants.

The answer of the defendants to the plaintiff's petition, insofar as necessary to consider, denied each and every allegation contained in said petition; specifically denied that the plaintiff was falsely arrested and detained or deprived of his liberty; and prayed that the plaintiff's petition be dismissed.

The defendants set forth seven assignments of error. We will discuss the assignments of error we deem necessary to a determination of this appeal.

The first assignment of error is that the trial court erred in overruling the motions on behalf of defendants and each of them for a directed verdict or, in the alternative, to dismiss the action as against the defendants.

" 'A motion for a directed verdict must for the pur-

pose of decision thereon be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the evidence.' " Larsen v. Omaha Transit Co., 165 Neb. 530, 86 N. W. 2d 564.

False imprisonment consists in the unlawful restraint against his will of an individual's personal liberty. See Robertson v. Safe Way Stores, Inc., 130 Neb. 82, 264 N. W. 153.

In Dillon v. Sears-Roebuck Co., 126 Neb. 357, 253 N. W. 331, this court said: "The essential thing to constitute an imprisonment is restraint of the person, which may be by threats as well as by actual force, and if the words and conduct are such as to induce a reasonable apprehension or fear of force, of disaster, or disgrace, a person may be as effectually restrained and deprived of liberty as by prison walls.

" 'Any intentional conduct chargeable to defendant, that results in placing of a person in a position where he cannot exercise his will in going where he may lawfully go, may constitute false imprisonment.' 25 C. J. 452. * * *

" 'In ordinary practice, words are sufficient to constitute an imprisonment, if they impose a restraint upon the person, and the party is accordingly restrained; for he is not obliged to incur the risk of personal violence and insult by resisting until actual violence be used.' Martin v. Houck, 141 N. Car. 317."

The record discloses that the Lewis & Smith Drug Company, known as Smith Drugs, is located at 314-316 South Fifteenth Street in Omaha, Nebraska.

The plaintiff testified that he left home before noon on December 23, 1955, took a bus, and arrived at the Smith Drug Store about noon; that he was familiar with the store, which was a self-service type of store;

that before he left home he had been working on the property he lived in; that he had a coal stoker which he was firing with slack which is coke dust and coal dust mixed with stoker coal; that he did not clean up before going down town because he was going back to work; and that he had on blue denim work pants, a tight sweater under a light tan coat, a hat, and a muffler around his neck to conceal his grimy work shirt. He further testified that his reason for going to the Smith Drug Store was to purchase some caroid and charcoal tablets and some groceries; that he wanted to buy a half-size bottle of charcoal tablets; that he talked to a pharmacist whom he called Vince and whose name was Vincent Ochs; that Vince did not have what the plaintiff wanted in the prescription department and he pointed to a large counter to one side and in front of the prescription counter; that the plaintiff went to the counter and found a box containing a bottle of the pills; that he discovered it was a large bottle of pills which he did not want; that he stood and looked at the box for a while; that he looked up and saw a lady staring at him; and that the lady turned and walked away, about 15 to 20 feet. In the meantime the plaintiff put the bottle down on the counter because he did not want it. He had opened the box, did not know whether or not he closed it, and doubted that he put the box back where he had picked it up. The plaintiff further testified that he had to purchase some bread and canned goods and make a call at the Gas Company. He walked to the grocery department but concluded there was no use in buying bulky groceries and carrying them to the Gas Company office and back to the drug store where he would take the bus to go home. He walked out the front door, which faces east, and proceeded south. When he had walked about 20 or 30 feet from the door and was out on the public sidewalk, he was stopped by the lady he had seen in the store. She spoke in a loud tone of voice and told him to come back into the store. He

asked her what for, and she told him he was under arrest for theft. She did not identify herself at that time. He went back into the store accompanied by the lady. They went through the front door to the rear of the store and up some stairs to the office. The lady had her hand on his overcoat, held onto him, told him where to go, and steered him along. She later identified herself as a policewoman. As the plaintiff walked into the office, he was the first one to speak, and he said: "I don't have anything of yours, and before you go too far with it, look it over, you are going to be embarrassed." He then took off his coat, turned the pockets inside out to show that he did not have anything, and said: "I haven't got a thing." The plaintiff further testified that a man he called Peters came to the office. The man the plaintiff called Peters was in fact an employee of the store by the name of Knight. The plaintiff testified that Knight stood in the doorway with his arms in such a position as to block the entrance, and did not say anything. The lady went out and came back with a large bottle of pills, which she placed on the desk. Vince Ochs came into the office for a little while and then left. Later Lee Smith arrived. A man the plaintiff did not know, but whose name was Martin, was in the office when the plaintiff and the lady arrived. Mr. Martin asked the plaintiff to sign a release, and said: "You will either sign a release to us or you will go to jail." On other occasions he was asked to sign the release, but declined to do so. He was told that if he did not sign the release he would be prosecuted. The store detective accused him of stealing a bottle of pills, and later of taking a portion of the pills out of the bottle. The plaintiff further testified that he attempted to use the telephone and Knight "cuffed" him on the head with the telephone; and that Smith assured him that the lady detective was retained by the company through Samardick & Company and had full and complete authority and his support, and anything she did was proper.

The plaintiff further testified that he was in the office about 1½ hours and was finally permitted to use the telephone and call his attorney. After talking to his attorney, the plaintiff became angry and finally asked to be taken to the police station. The detective told him that they did not handle it that way. Martin told the plaintiff that the substance of the release was that there was somewhere between three and five cents worth of tablets taken and if he would sign the release they would let him go. The plaintiff further testified that he made no attempt to leave during the session; that he told them to go ahead and make the arrest, to call an officer; that he put his name and address on a piece of paper and said: "Now, I am leaving; if you aren't going to arrest me, I am leaving, I can't stay here all day listening to this, and I am going to be here and if you want me, you come out and get me * * * I am going to be there waiting for you"; and that he left the premises. Mr. Knight left the office approximately 20 minutes prior to that time. The plaintiff denied taking any pills from the bottle.

The cross-examination of the plaintiff disclosed that the plaintiff did not remember whether he arrived at the drug store at noon or at 1:30 p.m.; in addition that his face and hands were dirty; and that dark markings could come from charcoal tablets unless they were taken with water and he admitted that he had taken no water.

Isabella Shover, a witness for the defendants, testified that on December 23, 1955, she was employed by Samardick & Company as a store detective stationed at Smith Drug Store and had been working there since December 1, 1955; that her duties were to watch for shoplifters; that she first noticed the plaintiff directly in front of the drug counter in the drug department which is at the back of the store; that she observed the plaintiff take a box from the counter, step between the counters, take the cap off the bottle, take the

cotton out and pour some pills into his hand, recap the bottle, and put it back in the box; that he then stepped over to the counter where he had picked up the box, noticed this witness, and waited around for her to leave; and that he finally dropped the box on the counter and went out of the store. She went out onto the street and asked him to come back into the store. She did not tell him she was a policewoman, nor did she touch his person. The plaintiff turned around and came back into the store through the front door, went to the rear of the store and upstairs to the office, and sat down in Mr. Smith's chair. She further testified that Mr. Martin was the only one in the office at the time. Mr. Martin looked up when the plaintiff came in. She told Mr. Martin that the plaintiff had opened a bottle of pills, dumped some of them into his hand, and put the box back on the counter. Mr. Martin asked the plaintiff if that was true and the plaintiff said yes, that he just bought a bottle of these a couple of days ago and he needed a few so he just took what he needed. This witness further testified that the incident in the office lasted from 30 to 45 minutes; that the plaintiff, Mr. Martin, and Mr. Knight were there, as well as herself; that while she was there the plaintiff called his attorney; that Mr. Knight did not "cuff" the plaintiff with the telephone; that the plaintiff was sitting at the desk when he used the telephone which was to the right side of anyone sitting at the desk; that Mr. Martin asked the plaintiff to sign a release to get the matter over with; that the plaintiff said he would not sign anything; and that the plaintiff had called his lawyer to find out what to do. Later the plaintiff put his name on a piece of paper and walked out. No one tried to stop him.

On cross-examination this witness testified that at the time she did not know how many pills the plaintiff took out of the bottle, but she saw him pouring the pills into his hand, and he kept them in his hand until later when he was in the office and then he ate them.

Subsequently she determined that the plaintiff had taken seven pills in view of the fact that originally there were 150 pills in the bottle and when they were counted there were only 143 pills left in the bottle. She further testified that she did not tell the plaintiff that he was under arrest; that there was no "rumpus"; that no one said anything at all at that time; that the plaintiff went into Mr. Smith's office and sat down; and that she was in the office most of the time until the plaintiff left and during that time the plaintiff did most of the talking.

On redirect examination this witness testified that she noticed the plaintiff's teeth were all black and the corners of his mouth and lips were black. When the plaintiff's attention was called to that fact he said he had been eating licorice and that was the reason his lips were black.

Stewart Knight testified that he was employed by Smith Drug Company as a receiving clerk for the drug department; that on December 23, 1955, he went to the office 2 or 3 minutes after the plaintiff arrived there and stayed until about 10 minutes after Mr. Smith arrived; that in all he was there probably 25 or 30 minutes; that after he left the office he did not return to the office; that when he left the office the plaintiff, Mr. Martin, Mrs. Shover, and Mr. Smith were there; that he remembered the plaintiff wanted to call and talk to his attorney; and that he also noticed that every once in a while the plaintiff would lick his lips, and his mouth kept getting blacker. This witness asked the plaintiff what he had been eating, and the plaintiff replied that he was eating licorice. That was the extent of his conversation with the plaintiff. This witness denied that he had "cuffed" the plaintiff with the telephone or that he had laid hands on the plaintiff. He further testified that he did stand in the doorway of the office 4 or 5 feet from the desk. On cross-examination he testified that he moved out of the doorway

to let Mr. Smith enter and then moved back into the doorway; and that he was 6 feet tall and weighed 225 pounds.

Vincent Ochs testified that he was a registered pharmacist employed by the Smith Drug Company; that he remembered being in the store on December 23, 1955; that the plaintiff came to him and asked for a bottle of caroid and charcoal tablets; and that they had only one bottle on hand which he showed to the plaintiff. The plaintiff said he did not want such a large bottle and asked this witness if he could sell him a few pills, but was told that they could not break the bottle for that purpose. This witness then left the plaintiff, went back to work behind the counter, and did not see the plaintiff go to the office with Mrs. Shover.

Frank Martin testified that he was vice president of the Smith Drug Company; that on December 23, 1955, he was in Mr. Smith's private office when Mrs. Shover and the plaintiff entered the office and the plaintiff sat in Mr. Smith's chair; that he and Mr. Smith had desks back to back and Mr. Smith sat facing him; and that Mr. Smith had a telephone on the right side of his desk against the wall. As Mrs. Shover came into the office, the plaintiff was laughing and this witness stated that he guessed he laughed also as it was such a trivial matter. The plaintiff said: "She thinks I took a whole bottle, * * * I had a bottle at home and I wanted a few, so I just took a few out and ate them." This witness further testified that Mrs. Shover stated clearly to him that the plaintiff had not taken the whole bottle. The plaintiff stated it was "silly" and that if Mr. Smith were present he would just laugh about it. This witness agreed that was probably true and said: "It is silly." This witness told the plaintiff he would make out a statement that would contain the exact facts, that is, that the plaintiff had taken only a few pills, and if the plaintiff would sign the statement there would be no further conditions. The plaintiff refused to sign the

statement. He further testified that the plaintiff's lips were getting black but there was not much said to the plaintiff about this as the plaintiff freely admitted that he had eaten the pills; and that later Mr. Smith said something about the plaintiff's lips getting black and the plaintiff said he had been eating licorice. This witness said the plaintiff was in the office probably not over half an hour. On cross-examination this witness testified that neither he nor anyone asked the plaintiff to pay for the pills; that no formal charges were made against the plaintiff; and that the purpose of obtaining a release of the type he wanted the plaintiff to sign was so that if a similar occurrence would happen they might want to prosecute.

W. Lee Smith testified that he was president and treasurer of the Smith Drug Company; that when he arrived at his office on December 23, 1955, he found the plaintiff and others in his office; that he knew the plaintiff as a customer; that the plaintiff was sitting in the chair at this witness' desk; and that Mr. Martin, Mrs. Shover, and Mr. Knight were also in the office. This witness testified that he remained in the office not over 15 minutes while the plaintiff was there. This witness further testified that as he walked into the office the plaintiff arose from the chair and said: "They claim I have been shoplifting. I have nothing." This witness noticed that the plaintiff was black around his mouth. Mr. Martin remarked that the plaintiff had taken charcoal pills out of a bottle which was on a counter in the store and had eaten them. This witness sat down on the sofa, and the plaintiff picked up the telephone and started dialing his attorney. This witness remarked that he did not like to have things like that happen, and explained that there would be a shortage in the bottle and if another customer bought it, it would be injurious to the reputation of the store and the manufacturer. After Mr. Smith talked to the plaintiff about the seriousness of this matter, Mr. Martin remarked that he

concluded· that ·it. was too silly to continue any discussion, and that, the plaintiff had admitted the act when he first came into the office. After the discussion, the plaintiff wrote his name and address on a piece of paper and said he was going to leave. He then left, and· no one tried to detain or stop him. After ·the plaintiff left the store Mrs. Shover handed the bottle of pills to Mr. Smith and he took it to the prescription counter· where the pills were counted. There were 143 pills in the bottle when there should have been 150. This witness; on cross-examination testified that while he· was in·.the office no one offered to arrest the plaintiff or take· him to the police station although the plaintiff requested that he be taken there, nor during the. time that this witness was in the office did anyone ask the plaintiff to sign the release; and that someone else could have taken the pills out of the bottle where it was on the display counter. He would not state as a fact that there were 150 pills in the bottle.

"Where there is a conflict of testimony in an action for false imprisonment, credibility of witnesses and weight of evidence are questions for the jury." Doescher v. Robinson, 132 Neb. 299, 271 N. W. 784.

"In an action where there is any evidence which will support a finding for a party having the burden of proof the trial court cannot disregard it and direct a verdict against him." Haight v. Nelson, 157 Neb. 341, 59 N. W. 2d 576, 42 A. L. R. 2d 1. See, also, Larsen v. Omaha Transit Co., *supra.*

In the light of the evidence and the above-cited authorities, we conclude that the evidence was sufficient to submit the case to the jury, and the trial court did not commit prejudicial error in overruling the defend- ants' motions for directed verdict or in the alternative motions to dismiss the plaintiff's cause of action.

This brings us to the defendants' assignment of error that the trial court erred in refusing to grant a new

trial on the ground that the damages were excessive and not sustained by the evidence.

"The law does not prescribe a definite rule for the ascertainment of the exact amount recoverable for false imprisonment." Doescher v. Robinson, *supra.*

It is difficult to determine just what the damages should be for false imprisonment of this sort. The plaintiff may recover such a sum as will fairly and reasonably compensate him for the shame, humiliation, disgrace, and mental anguish the evidence shows that he suffered by virtue of the false imprisonment. These are matters which cannot be measured with accuracy. See, Doescher v. Robinson, *supra;* Dillon v. Sears-Roebuck Co., *supra.*

The evidence relating to the damages for which the plaintiff claims he is entitled to recover may be summarized as follows: Mr. Knight had seen the plaintiff in the store on quite a few occasions previous to the incident, and knew the plaintiff only by his first name, Stanley. The plaintiff would go into the store and pass the time of day with the employees, including Mr. Knight whom the plaintiff referred to as Mr. Peters. Since the time of the incident, Mr. Knight no longer saw the plaintiff when they met on the street, and Mr. Smith did not speak to the plaintiff. The plaintiff testified that the detective steered him along the store to the office when the store was full of customers, more than at any other time that the plaintiff had been there; that all of the sales people he knew were on duty at that time; and that he felt "pretty cheap" when he was brought back into the store and went down the aisle with the detective. The plaintiff further testified that he had been connected with a rackets committee relative to the drug racket and had been working with and conveying his information to the two United States Senators from Nebraska; and that he had occasion to worry about the incident becoming known to his discredit when he attended a conference in Washington 2 weeks prior

to the time of trial. The plaintiff also testified that while he was in the office of the Smith Drug Company, the only exit was blocked by Mr. Knight who was 6 feet tall and weighed 225 pounds. Mr. Knight was an employee of the drug company, and he stood with his elbows in the doorjamb and did not say a word. The plaintiff further testified that during the time he was in the office of the Smith Drug Company he was "cuffed" on the head by Mr. Knight when he endeavored to use the telephone to call his attorney; and that during the period of time he was in the drug company office he was subjected to threats by Mr. Martin, Mr. Smith, and Mrs. Shover, the detective, of going to jail and not being turned loose until he signed a release.

As we view the damages awarded by the jury and the record relating to the damages the plaintiff claims he sustained, we conclude that the verdict was entirely disproportionate to any damages proved by the plaintiff. The plaintiff did not offer any evidence that anyone other than he and Mrs. Shover, the detective, knew what was occurring. The evidence fails to show that there was any loss of friends to the plaintiff by virtue of the incident, or any economic loss to him. For the most part, the evidence adduced by the plaintiff relative to damages is speculative and conjectural.

It is a well-established principle of law that where a verdict is excessive and that it appears to have been returned under the influence of passion and prejudice rather than upon the facts or that the jury misapplied the law, it is the duty of this court to set the verdict aside and grant a new trial. Peacock v. J. L. Brandeis & Sons, 157 Neb. 514, 60 N. W. 2d 643.

"Where it is clear that a verdict is excessive but there is no method by which the court can rationally ascertain the extent of the excess, a remittitur cannot be properly required since a remittitur would amount only to a substitution of the judgment of the court for that of the jury." Peacock v. J. L. Brandeis & Sons, *supra.*

We conclude that the verdict was excessive as contended for by the defendants.

Other assignments of error are not necessary to determine.

For the reasons given in this opinion, the judgment is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.

CARTER, J., dissenting.

In my opinion the judgment in this case should be reversed and the cause dismissed. I find no fault with the technical definitions of false arrest and false imprisonment set forth in the majority opinion. This dissent is directed at the failure of the majority to give consideration to the right of a storekeeper to protect his property and to reasonably detain a shoplifter or petty thief for the purpose of investigation. I submit that a detention to be unlawful must be unreasonable as to time and manner. The following text and case authorities sustain this position:

"Ordinarily, also, the owner of property, in the exercise of his inherent right to protect the same, is justified in restraining another who seeks to interfere with or injure it where the restraint or detention is reasonable in time and manner. In such cases, probable cause is a defense, even though the injury which is about to be inflicted constitutes only a misdemeanor, for it is the existence of reasonable grounds to suppose that one's person or property is in danger which gives rise to the right of protection." 22 Am. Jur., False Imprisonment, § 78, p. 408.

"Generally speaking, the owner may restrain one seeking to interfere with his property or to injure it without becoming liable for false imprisonment." 35 C. J. S., False Imprisonment, § 14, p. 515.

The most cited case on this subject appears to be Collyer v. S. H. Kress & Co., 5 Cal. 2d 175, 54 P. 2d 20. The facts are almost identical with the present case. The store detective, a Mrs. Croswell, and her assistant

saw the plaintiff pilfer certain articles from a display counter. He was intercepted as he was leaving the store and escorted back through the store to a room on the second floor for the purpose of investigation. He was accused of pilfering the articles which he denied, claiming that he had paid for them. As here, he refused to sign a statement. The police were called and he was placed under arrest. His cause of action for false imprisonment was predicated on his detention from the time he was accosted near the store entrance to the time he was taken into custody by the police. In holding the detention not to have been unlawful as a matter of law, the court said: "* * * where a person has reasonable grounds to believe that another is stealing his property, as distinguished from those where the offense has been completed, that he is justified in detaining the suspect for a reasonable length of time for the purpose of investigation in a reasonable manner * * * must necessarily proceed upon the theory that probable cause is a defense. And this is the law because the right to protect one's property from injury has intervened. In an effort to harmonize the individual right to liberty with a reasonable protection to the person or property of the defendant, it should be said in such a charge of false imprisonment, where a defendant had probable cause to believe that the plaintiff was about to injure defendant in his person or property, even though such injury would constitute but a misdemeanor, that probable cause is a defense provided, of course, that the detention was reasonable. * * * What is probable cause, as has been often announced, is not a question of fact for the jury, but one of law for the court, to be decided in accordance with the circumstances at the time of the detention, unhampered by the outcome of the charge against the plaintiff of the public offense or by the conclusions of the trial court. * * * So determined, it appears from the record in this case that the defendants were not only justified in detaining plaintiff, but also,

under the evidence, would have been justified in arresting plaintiff under the authority of subdivision one of section 837 of the Penal Code." Other cases supporting this view are: Swafford v. Vermillion (Okl.), 261 P. 2d 187; Banks v. Food Town, Inc. (La. App.), 98 So. 2d 719; Alterauge v. Los Angeles Turf Club, 97 Cal. App. 2d 735, 218 P. 2d 802; S. H. Kress & Co. v. Bradshaw, 186 Okl. 588, 99 P. 2d 508; Atchison, Topeka & Santa Fe Ry. Co. v. Hinsdell, 76 Kan. 74, 90 P. 800, 12 L. R. A. N. S. 94; Shinglemeyer v. Wright, 124 Mich. 230, 82 N. W. 887, 50 L. R. A. 129; Sweeney v. F. W. Woolworth Co., 247 Mass. 277, 142 N. E. 50, 31 A. L. R. 311; Jacques v. Childs Dining Hall Co., 244 Mass. 438, 138 N. E. 843, 26 A. L. R. 1329; Fenn v. Kroger Grocery & Baking Co. (Mo.), 209 S. W. 885; Foulke v. New York Consolidated R. R. Co., 228 N. Y. 269, 127 N. E. 237, 9 A. L. R. 1384.

Under the foregoing authorities, and a consideration of all the evidence and circumstances, I submit that the detention of the plaintiff was reasonable as to time and manner and, consequently, not unlawful. It follows that plaintiff failed to make a case and that defendants' motion for a directed verdict should have been sustained.

The effect of the majority opinion is to permit a shoplifter or petty thief to maintain an action for false arrest or false imprisonment irrespective of the rights of the owner of the property and the reasonableness of the detention. It permits such a plaintiff to go to the jury on the self-serving conclusions of the plaintiff that he was falsely arrested or falsely imprisoned, without a consideration of all the facts and circumstances shown by the record and the intervening rights of the store owner to protect his property. It leaves the store owner in the position where he subjects himself to an action for false arrest or false imprisonment if he undertakes to protect his property by detaining the shoplifter, however reasonable the detention or however great the

probable cause shown. In my judgment this is not and ought not to be the law.

The defendants pleaded in their answer that they had reasonable grounds to justify themselves in detaining the plaintiff to investigate the wrongful taking of the company's property, and that the facts and circumstances constituted probable cause for the investigation. The trial court did not submit this defense to the jury. The defendants assigned this as error. The majority opinion makes no reference to this assignment of error. I submit that the defendants are entitled to have this question answered, even though a retrial of the case is awarded. This court has consistently held that it is the duty of the trial court, without request, to properly instruct the jury upon all material issues presented by the pleadings and the evidence, including affirmative defenses, and that a failure to so do constitutes prejudicial error. Owen, Admr. v. Moore, 166 Neb. 226, 88 N. W. 2d 759. I submit that the trial court erroneously failed to submit defendants' theory of the case to the jury.

The trial court, by its instruction No. 5, instructed the jury that any arrest or detention of plaintiff's person without his consent and against his will for any length of time constituted the elements to be proved to permit the recovery of a judgment. The jury was not told that the arrest or detention had to be wrongful or unlawful. This was clearly error prejudicial to the rights of the defendants. Under this instruction the plaintiff is permitted to recover even if the arrest and detention were lawful. This is plain error and we so held in Barton v. Wilson, 168 Neb. 480, 96 N. W. 2d 270, wherein we said: "The instructions do not define either positively or negatively, in the light of the evidence adduced on the trial, what would amount to false arrest or false imprisonment. From the instructions given the jury could not comprehensively determine the paramount issue in this case, that is, whether or not plaintiff was unlawfully arrested

and detained by the defendants." The giving of instruction No. 5 was assigned as error and not considered in the majority opinion.

For the reasons herein stated I respectfully but firmly insist that the majority opinion does not properly dispose of the appeal.

CHAPPELL, J., concurs in this dissent.