ROBERT HOLMES, APPELLANT AND CROSS-APPELLEE, V.
CROSSROADS JOINT VENTURE, AN INDIANA PARTNERSHIP,
ET AL., APPELLEES AND CROSS-APPELLANTS.

629 N.W.2d 511

Filed July 6, 2001.   No. S-99-438.

Frank E. Robak, Sr., for appellant.

Patrick B. Griffin and Marcia A. Rezac, of Kutak Rock, for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## NATURE OF CASE

Robert Holmes, the plaintiff, was taken into custody by security officers of Crossroads Mall (Mall) in Omaha, Nebraska, following an altercation outside the Mall with two students from the high school where Holmes was employed. Holmes was

banned from the Mall for a period of 1 year and was again detained when he returned to the Mall less than a year after the first incident. Holmes sued, alleging causes of action for assault and battery, false imprisonment, and malicious prosecution. Holmes won jury verdicts on the assault and battery and one of the false imprisonment claims, but the district court granted the defendants' motion for new trial as to those causes of action. The primary questions presented in this appeal are whether the district court (1) abused its discretion in granting the motion for new trial or (2) erred in directing verdicts against Holmes on his malicious prosecution causes of action.

## FACTUAL BACKGROUND

On July 9, 1994, Holmes went by himself to the Mall to pay a department store bill. Holmes is a former U.S. Marine and was employed at the time as a security guard for the Omaha Public Schools at Benson High School. While at the Mall, Holmes saw two female Benson students, O.J. and K.C. Holmes testified that O.J. approached Holmes and asked Holmes why he had her "kicked out" of school. Holmes said that O.J. asked Holmes to go outside with her and talk about it, and Holmes agreed. K.C., however, testified that Holmes approached her and O.J. and initiated an argument inside the Mall.

Holmes testified that as he walked out of the Mall with O.J. and K.C., K.C. asked O.J., "[A]re you going to kick Mr. Holmes' ass now?" Holmes testified that O.J. came at him and that he heard a click, which he thought was a gun or switchblade. K.C., however, testified that Holmes started the physical confrontation by pulling O.J.'s hair. Holmes testified that he grabbed O.J.'s arm and spun her around and released her when he saw that she did not have a weapon. Holmes testified that K.C. then attacked him, and Holmes struck her on the arms to defend himself. Holmes said that when K.C. backed away, O.J. attacked Holmes and tore his shirt, then Holmes picked up O.J. and "threw her out of the way." Holmes testified that at that point, the fight stopped.

Holmes said that Ted Rummel, a Mall security officer, then came out of the Mall and asked what was happening, and K.C. told Rummel that Holmes had hit her. Holmes testified that

Rummel ran up to Holmes, pushed him, and said, "You like to fight little girls? Fight me!" Holmes stated that Rummel pushed Holmes again and repeated himself. Joe Leggett, another Mall security officer, testified that he was inside the Mall with Rummel when the fight outside caught Rummel's attention. Leggett testified that when he went outside, he saw Rummel push and strike Holmes. Rummel testified that when he and Leggett were inside the Mall, Rummel saw Holmes and O.J. and K.C. wrestling and punching one another. Leggett testified that he did not hear Rummel challenge Holmes to fight.

Holmes testified that he kept his hands to his sides, tried to remain calm, and then turned his back on Rummel. Holmes stated that Rummel then attacked Holmes from behind, using his right arm to put pressure on Holmes' jugular vein, while yelling at Holmes to get down. Rummel, on the other hand, testified that Rummel first had to separate the combatants and that Holmes kept trying to get past Rummel to get to O.J. and K.C. despite repeated commands to stay back. Rummel and Leggett testified that Rummel attempted to place Holmes in a vascular neck restraint, a maneuver intended to cut off blood to the brain and induce unconsciousness. Holmes said that he saw flashing lights and felt like he was "getting ready to go," so he used his left arm, which was free, to remove Rummel's arm.

Holmes testified that at that point, Rummel was joined by Leggett, who approached and asked Rummel what Holmes had done. Leggett denied making this statement. Holmes testified that Rummel asked Leggett for assistance and that Leggett helped Rummel get Holmes to the ground. Holmes testified that he never made any offensive movements directed at the security officers. Rummel, however, testified that when Holmes refused to stop trying to get to O.J. and K.C., Rummel and Leggett tried to subdue Holmes and take Holmes to the ground. Leggett testified that Holmes had been coming forward toward Rummel, O.J., and K.C. prior to Rummel's attempted vascular neck restraint. K.C. testified that when the Mall security officers seized Holmes, Holmes resisted and attempted to get away from the officers. Rummel testified that Holmes was finally taken down by a knee strike.

Holmes testified that Rummel and Leggett dragged Holmes along the ground to the curb, kicking him along the way. Holmes stated that the officers bent Holmes' head over the curb, placing pressure on the back of Holmes' neck, and that Holmes was kicked in the back. Rummel and Leggett denied this. Holmes testified he thought that his head was going to be struck by an approaching vehicle. Holmes said that the officers then handcuffed him and lifted him up. Rummel and Leggett, to the contrary, testified that Holmes continued to resist while on the ground. Jeff Noble, another Mall security officer, also testified that Holmes resisted the officers. Holmes testified that a large number of people were in the vicinity and had observed the incident.

Holmes was placed into a Mall security vehicle and taken to the Mall office. Holmes was detained in the Mall office and questioned by several security personnel. Holmes was bleeding from his injuries the entire time he was in the office, and he was photographed by one of the officers. Holmes testified that he remained in handcuffs, although Mark Sundermeier, an off-duty Omaha police officer who was working at the Mall, testified that the handcuffs were removed after 10 to 20 minutes when Holmes calmed down. Holmes testified that he was in the office for 45 minutes to 1 hour, and perhaps longer. Holmes stated that one of the officers brought Holmes a form and said that Holmes would not be permitted to leave until Holmes signed the form. Holmes later testified he was told that "if you don't sign the papers, you will go downtown." Rummel and Leggett denied these allegations. Holmes signed the document, which was a form that banned Holmes from the Mall for 1 year.

Holmes testified that he was bleeding from abrasions on his knees, shin, and chest. Rummel testified that these injuries resulted from Holmes' struggling while outside. Holmes testified that when he was released, he was in a great deal of pain and went straight home, where he instructed his family to photograph his injuries to document them. After that, Holmes went to the emergency room. The photographs taken by Holmes' family and by Mall security were admitted into evidence and show bloody abrasions on Holmes' knees and the front of Holmes' left shoulder. Emergency department records from Immanuel

Medical Center showed that Holmes visited the emergency room on July 9, 1994, and had multiple abrasions and contusions. Holmes was treated with Polysporin, Tylenol, and ice.

Holmes testified that he did not return to the doctor after that because he could not afford it. Holmes testified that at the time of trial, he still had scars on his shoulders, chest, and knees that caused him discomfort. Holmes also testified that the incident exacerbated a preexisting problem with his back that had first developed during Marine Corps boot camp. Holmes stated that he bought a whirlpool device for his bathtub to help relieve his recurring pain and that he spent about 3 or 4 days lying on cushions on his waterbed as a result of his injuries. Holmes admitted that he was still playing softball during this period, but stated that he was sitting on the bench.

Holmes also testified that he was issued a citation by an off-duty Omaha police officer, later identified as Sundermeier. This citation was for disturbing the peace. Holmes testified that Sundermeier issued the citation after discussing the incident with Mall employees. Rummel denied being involved in the decision to issue a citation, although Sundermeier testified that the citation was issued based upon Sundermeier's interviews of Rummel and Leggett. Holmes testified that he was concerned about the criminal prosecution because, to work for the Omaha Public Schools, he had to make sure that his record remained clean. The criminal case was later dismissed by the Douglas County Attorney.

Holmes returned to the Mall on January 28, 1995, after the criminal charge had been dropped. Holmes testified that based on what he had been told at the time of the ban, he thought he was no longer banned from the Mall because the criminal complaint had been dismissed. Holmes was accompanied at the time by his 10-year-old daughter. Holmes was confronted by Leggett, who approached Holmes and confirmed Holmes' identity. Leggett then spoke to Dan Clark, an off-duty Omaha police officer who was working at the Mall. Clark testified that he confirmed with Mall employees that Holmes had been banned from the Mall, so he approached Holmes and informed Holmes that Holmes was under arrest for trespassing. Holmes testified that he was taken to the Mall office, searched, questioned, held for 1 to 1½ hours, and cited for trespassing by Clark.

Holmes also testified that while he was held, he was subjected to harassment and racial slurs. Holmes is African-American. Holmes' daughter essentially corroborated Holmes' version of the events. Rummel, Leggett, and Clark denied that any derogatory or threatening conversation took place. Clark testified that Holmes was angry and verbally confrontational during the incident.

Holmes stated that he appeared in court with his attorney on the trespassing charge and was found not guilty after a bench trial due to a lack of evidence against him. However, county court records entered into evidence show that the charge was dismissed on the motion of the court and do not show a determination regarding guilt or innocence.

## PROCEDURAL HISTORY

Holmes filed suit in the district court against Crossroads Joint Venture, the owner of the Mall, and MS Management Associates, Inc., the managing company for the Mall. Holmes also sued several Mall security officers, including Rummel, Leggett, Clark, and Scott Beran. Holmes alleged five causes of action: (1) assault and battery during the July 9, 1994, incident, (2) false imprisonment on July 9, (3) malicious prosecution for the citation issued as a result of the July 9 incident, (4) false imprisonment on January 28, 1995, and (5) malicious prosecution for the citation issued as a result of the January 28 incident.

The case proceeded to a jury trial, at which the evidence set forth above was adduced. The district court denied the defendants' motions for directed verdict on the false imprisonment causes of action, both at the conclusion of Holmes' case and at the close of all the evidence. The district court sustained the defendants' motions for directed verdict on the malicious prosecution claims at the close of Holmes' case, however, finding that there was no evidence presented of any damages resulting from the prosecutions. The district court also specifically dismissed the malicious prosecution causes of action against one of the defendants, Beran, because there was no evidence of "anything at all in the record that would show any liability on the part of Beran."

The case was submitted to the jury on the remaining causes of action. The jury returned verdicts for Holmes in the amount

of $250,000 on the assault and battery cause of action and in the amount of $50,000 on the July 9, 1994, false imprisonment cause of action. The jury found in favor of the defendants on the January 28, 1995, false imprisonment cause of action. Judgment was rendered in accordance with the verdicts.

The defendants filed motions for judgment notwithstanding the verdict and motions for new trial. The motions for judgment notwithstanding the verdict were denied, but the motions for new trial were granted on the grounds that the $250,000 and $50,000 verdicts were excessive and were not supported by the evidence. It is from the district court's order for new trial that Holmes appeals.

## ASSIGNMENTS OF ERROR

Holmes assigns, consolidated and restated, that the district court erred in (1) granting the defendants' motions for new trial, (2) not limiting the new trial to the issue of damages, and (3) granting directed verdicts on the malicious prosecution causes of action. Holmes assigned other errors, but did not argue those errors in his appellate brief; hence, we do not consider them. Errors that are assigned but not argued will not be addressed by an appellate court. *Hawkins v. City of Omaha*, 261 Neb. 943, 627 N.W.2d 118 (2001).

On cross-appeal, as restated, the defendants assign that the district court erred in failing to enter a judgment notwithstanding the verdict on the July 9, 1994, false imprisonment cause of action.

## STANDARD OF REVIEW

A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Genetti v. Caterpillar, Inc.*, 261 Neb. 98, 621 N.W.2d 529 (2001). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Fine v. Fine*, 261 Neb. 836, 626 N.W.2d 526 (2001).

In considering an appeal from an order granting a motion for directed verdict at the close of the plaintiff's case, an appellate court must determine whether the cause of action was

proved and in so doing must consider the plaintiff's evidence as true and give the plaintiff the benefit of reasonable conclusions deducible from that evidence. *King v. Crowell Memorial Home*, 261 Neb. 177, 622 N.W.2d 588 (2001); *Cole v. Loock*, 259 Neb. 292, 609 N.W.2d 354 (2000).

■ On a motion for judgment non obstante verdicto, or notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence. *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001).

## ANALYSIS

### NEW TRIAL ON DAMAGES

The district court sustained the defendants' motion for new trial based upon Neb. Rev. Stat. § 25-1142 (Reissue 1995), which provides, in relevant part, that a verdict "shall be vacated and a new trial granted on the application of the party aggrieved, for any of the following causes, affecting materially the substantial rights of such party: . . . (4) excessive damages, appearing to have been given under the influence of passion or prejudice." In determining that a new trial was warranted, the district court set forth a detailed discussion of the evidence presented at trial to support the damages awarded. The district court stated:

> In connection with the assault and battery claim of July 9, 1994, the photographs in evidence showed a bruise on the plaintiff's left shoulder and bruises and bleeding in the area of both of his knees.
>
> The plaintiff went to Immanuel Medical on July 9, 19[9]4, and the diagnosis was multiple contusions and multiple abrasions.
>
> . . . .
>
> The plaintiff also testified, as regards the July 9, 1994, assault and battery claim, that his arm was twisted; that he was kneed in the back; that he was hit on the side; that he was thrown on the ground and hurt his back; that he was

dragged on the ground; that a foot was put on his neck; and that he was handcuffed.

The plaintiff testified that he still has scars on his chest, shoulders and knees. He said that his injuries were not life threatening.

The plaintiff further testified that he left the Crossroads Mall about 4:30 p.m. on July 9, 1994, and went to the Immanuel Medical Center about 7:00 p.m. that same day. The plaintiff said he was in pain throughout his body, but told the hospital he had no neck, back or chest pain. . . . The plaintiff also played softball after the July 9, 1994, incident, although he apparently sat on the bench.

There was also testimony by defendant Ted Rummell [sic] that a vascular restraint was placed on the plaintiff by Rummell [sic]. Officer Mark Sundermeier said the plaintiff was flushed, upset and angered.

No medical bills were offered or received in evidence, nor was there a stipulation regarding medical bills. The plaintiff did testify, however, as to certain medical expenses.

There was no medical testimony by a doctor or any other health professional.

There is absolutely no evidence of any permanent injury; of any permanent disability; of any future medical expenses; of any inability to work; or of any loss of earning capacity. In fact, the plaintiff received no medical attention after he went to Immanuel Medical Center on the day of the incident.

. . . In connection with the false imprisonment claim on July 9, 1994, the evidence was that the plaintiff was in the security office for 45 to 60 minutes, and he stated that he was bleeding the whole time.

. . . The jury verdicts of $250,000.00 and $50,000.00 are both clearly exorbitant as to indicate that they were the result of passion, prejudice, mistake or some means not apparent on the record. The verdicts are not supported by the evidence, and they do not bear a reasonable relationship to the elements of the damages proved.

■ In evaluating the district court's determination, it is important to recognize that we are not reviewing a jury verdict to determine if it is supported by sufficient evidence. Rather, we are reviewing the district court's order granting a new trial, and for good reason, our analytical framework is much different. The issue presented in the instant appeal is not whether the jury could reasonably conclude that Holmes suffered pain, humiliation, and mental distress entitling him to compensatory damages. The issue presented is whether the district court abused its discretion in determining that the damages awarded were excessive. In resolving that issue, this court views the evidence favorably to the trial court's actions rather than to the original jury's verdict.

■ The standards of review set forth above are not mere shibboleths, reiterated out of habit, but instead reflect considerations imperative to appellate review. Deference to a trial court's grant of a new trial stems in part from the recognition that the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the surrounding circumstances and atmosphere of the trial. *Malone v. Courtyard by Marriott*, 74 Ohio St. 3d 440, 659 N.E.2d 1242 (1996).

■ The trial judge sees the witnesses, hears the testimony, and has a special perspective on the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record. *Reeves v. Markle*, 119 Ariz. 159, 579 P.2d 1382 (1978) (en banc). For this reason, the trial judge is accorded significant discretion in granting a new trial. Due to his or her unique position, the trial judge becomes the primary buffer against verdicts not supported by the evidence. This is particularly true when the elements of damage are intangibles and the appraisal depends a great deal on an observation of the plaintiff and the evaluation of his or her testimony. See *Daniel v. Sharpe Const. Co., Inc.*, 270 S.C. 687, 244 S.E.2d 312 (1978).

In considering the judicial examination of jury awards in the federal system, the U.S. Supreme Court has noted that primary responsibility for application of an excessiveness standard is lodged in the district court, not the court of appeals, because trial judges have the unique opportunity to consider the evidence in the living courtroom context, while appellate judges see only the cold paper record. *Gasperini v. Center for Humanities, Inc.*,

518 U.S. 415, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996), citing *Taylor v. Washington Terminal Company*, 409 F.2d 145 (D.C. Cir. 1969). " 'If we reverse, it must be because of an abuse of discretion. . . . The very nature of the problem counsels restraint. . . . We must give the benefit of every doubt to the judgment of the trial judge.' " 518 U.S. at 438-39.

The necessity of this unique power to grant a new trial is a long-established principle. The exercise of the trial court's power to set aside the jury's verdict and grant a new trial is not in derogation of the right of trial by jury but is one of the historic safeguards of that right. *Gasperini v. Center for Humanities, Inc., supra.* If it appears that the jury has committed a gross error, or has given damages excessive in relation to the person or the injury, the U.S. Supreme Court stated it is as much the duty of the court to interfere, to prevent the wrong, as in any other case. See *id.,* citing *Blunt v. Little*, 3 F. Cas. 760 (C.C.D. Mass. 1822) (No. 1,578). As stated by Lord Mansfield over two centuries ago:

> Trials by jury, in civil causes, could not subsist now, without a power, somewhere, to grant new trials.
>
> . . . .
>
> Most general verdicts include legal consequences, as well as propositions of fact: in drawing these consequences, the jury may mistake, and infer directly contrary to law.
>
> . . . .
>
> If unjust verdicts, obtained under these and a thousand like circumstances, were to be conclusive for ever, the determination of civil property, in this method of trial, would be very precarious and unsatisfactory. It is absolutely necessary to justice, that there should . . . be opportunities of reconsidering the cause by a new trial.

*Bright v. Eynon*, 1 Burr. 390, 393, 97 Eng. Rep. 365, 366 (1757). It is important to note that the order of a new trial does not terminate a case, instead, it simply grants a new trial, and its purpose is to prevent miscarriages of justice, which, on occasion, occur at the hands of juries, by presenting the same matter to a new jury. See *Malone v. Courtyard by Marriott*, 74 Ohio St. 3d 440, 659 N.E.2d 1242 (1996).

We are aware that there are decisions of this court indicating that in reviewing an order granting a motion for new trial, an appellate court should test the sufficiency of the evidence in the light most favorable to the jury verdict. See, *Kehm v. Dumpert*, 183 Neb. 568, 162 N.W.2d 520 (1968); *Chaloupka v. State*, 176 Neb. 746, 127 N.W.2d 291 (1964). The dissent also cites *McCune v. Neitzel*, 235 Neb. 754, 457 N.W.2d 803 (1990), and *Vacek v. Ames*, 221 Neb. 333, 377 N.W.2d 86 (1985), for the same proposition. The court in *McCune v. Neitzel, supra,* however, relied on *Hutchens v. Kuker*, 168 Neb. 451, 96 N.W.2d 228 (1959). *Hutchens* was an appeal from a bench trial, and the *McCune* court did not explain why or how the court's traditional deference to the trial court's findings of fact in a bench trial should be applied where a jury trial had been held and a motion for new trial granted. Similarly, the *Vacek* court relied upon *Kniesche v. Thos*, 203 Neb. 852, 280 N.W.2d 907 (1979), in which the issue was the trial court's refusal to direct a verdict in favor of the plaintiff, and the *Vacek* court did not explain why the standard of review from the *Kniesche* case was to be applied in this different procedural context. In short, these cases, without adequate analysis or explanation, are inconsistent with our long-established holding that an appellate court "will not ordinarily disturb a trial court's order granting a new trial, and will not disturb it at all unless *it clearly appears that no tenable grounds existed therefor.*" (Emphasis supplied.) *Shreves v. D. R. Anderson Constructors, Inc.*, 206 Neb. 433, 438-39, 293 N.W.2d 106, 109 (1980). Accord, e.g., *Juniata Feedyards v. Nuss*, 216 Neb. 29, 342 N.W.2d 1 (1983); *Hegarty v. Campbell Soup Co.*, 214 Neb. 716, 335 N.W.2d 758 (1983); *County of Hall ex rel. Wisely v. McDermott*, 204 Neb. 589, 284 N.W.2d 287 (1979); *Johnson v. Enfield*, 192 Neb. 191, 219 N.W.2d 451 (1974); *Lechliter v. State*, 185 Neb. 527, 176 N.W.2d 917 (1970); *Webster v. Halbridge*, 185 Neb. 409, 176 N.W.2d 8 (1970); *Blobaum v. State*, 179 Neb. 304, 137 N.W.2d 855 (1965); *Nesmith v. Clarke*, 135 Neb. 117, 280 N.W. 429 (1938); *Bonacci v. Cerra*, 134 Neb. 588, 279 N.W. 314 (1938); *Clausen v. Omaha Loan & Bldg. Ass'n*, 131 Neb. 666, 269 N.W. 517 (1936); *De Matteo v. Lapidus*, 116 Neb. 549, 218 N.W. 379 (1928).

For instance, in *McMillan Co. v. Nebraska E. G. & T. Coop., Inc.*, 192 Neb. 744, 224 N.W.2d 184 (1974), the trial court deter-

mined that the damages awarded by the jury to the plaintiff were excessive and entered an order requiring the plaintiff to file a remittitur or the defendant's motion for new trial would be sustained. We stated that "[u]nless we can say that there is no legal cause or reason for ordering the conditional remittitur or granting a new trial, the action of the trial court must be sustained." *Id.* at 748, 224 N.W.2d at 187. We affirmed the trial court's decision, concluding:

> It is only necessary that we find tenable grounds to support the conclusion that the jury verdict . . . is excessive. Such grounds are clearly present.
>
> The trial court was acting within the proper bounds of its discretion in entering the order granting a new trial upon the refusal of the plaintiff to file the remittitur.

*Id.* at 750, 224 N.W.2d at 188. See, also, e.g., *Scherz v. Platte Valley Public Power and Irrigation District,* 151 Neb. 415, 37 N.W.2d 721 (1949) (holding that where there is evidence sufficient to sustain finding of trial court that prejudicial error was contained in record, there is no basis for stating that trial court abused discretion in granting new trial).

The dissent to this case concedes that this court should uphold a grant of a new trial if any tenable grounds support the trial court's decision. Nonetheless, the dissent concludes that this court should review the evidence regarding damages in the light most favorable to the jury's verdict. It bears repeating at this point that the issue on appeal is not whether the jury could reasonably conclude that Holmes suffered pain, humiliation, and mental distress entitling him to damages; rather, the issue presented is whether the district court abused its discretion in determining that the damages awarded were excessive. Not adequately explained in the dissent is how, precisely, an appellate court under an abuse of discretion standard of review is to exercise deference to both the trial court's decision and the award of the jury where the trial court (after having seen and heard the same evidence as the jury) has determined, pursuant to § 25-1142(4), that the damages awarded were excessive, appearing to have been given under the influence of passion or prejudice.

The dissent relies on several federal cases for the proposition that an appellate court should, in reviewing a trial court's

determination of a motion for new trial, review the evidence in the light most favorable to the jury's verdict. In each of the cases cited by the dissent for that proposition, however, the trial court had *denied* the motion for new trial, placing the appellate court in the procedural posture of directly reviewing the jury verdict and deferring to the trial court's refusal to set aside that verdict. See, *McNabola v. Chicago Transit Authority*, 10 F.3d 501 (7th Cir. 1993); *Velazquez v. Figueroa-Gomez*, 996 F.2d 425 (1st Cir. 1993); *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680 (2d Cir. 1993).

In fact, a review of cases in which the district court granted a remittitur or new trial shows that federal practice does not support the position taken by the dissent. The issue was discussed in depth in *Taylor v. Washington Terminal Company*, 409 F.2d 145 (D.C. Cir. 1969). The Court of Appeals for the District of Columbia stated:

> A more difficult question [than whether an order granting a new trial may be appealed] is the scope of appellate review of an order granting a new trial. It is by now standard doctrine that such orders may be reviewed for abuse of discretion, even when based upon such broad grounds as the trial judge's conclusion that the verdict was excessive or was against the weight of the evidence. There has been much discussion of the content which should be given to the elusive phrase "abuse of discretion," with the weight of learning against appellate reversal except in relatively rare cases.

> This learning has largely arisen from consideration of cases in which motions for new trial—especially on the ground of excessive verdict—have been *denied*. Two factors unite to favor very restricted review of such orders. The first of these is the deference due the trial judge, who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record. The second factor is the deference properly given to the jury's determination of such matters of fact as the weight of the evidence and the quantum of damages. This second factor is further weighted by the constitutional allocation to the jury of questions of fact.

Where the jury finds a particular quantum of damages and the trial judge refuses to disturb its finding on the motion for a new trial, the two factors press in the same direction, and an appellate court should be certain indeed that the award is contrary to all reason before it orders a remittitur or a new trial. However, where, as here, the jury as primary fact-finder fixes a quantum, and the trial judge indicates his view that it is excessive by granting a remittitur, the two factors oppose each other. The judge's unique opportunity to consider the evidence in the living courtroom context must be respected. But against his judgment we must consider that the agency to whom the Constitution allocates the fact-finding function in the first instance—the jury—has evaluated the facts differently.

In this jurisdiction particularly, District Court judges have given great weight to jury verdicts. They have stated that a new trial motion will not be granted unless the "verdict is so unreasonably high as to result in a miscarriage of justice," or, most recently, unless the verdict is "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate."

At the appellate level, in reviewing a trial judge's grant of a new trial for excessive verdict, we should not apply the same standard. *The trial judge's view that a verdict is outside the proper range deserves considerable deference. His exercise of discretion in granting the motion is reviewable only for abuse. Thus we will reverse the grant of a new trial for excessive verdict only where the quantum of damages found by the jury was clearly within the "maximum limit of a reasonable range."*

(Emphasis in original.) (Emphasis supplied.) *Id.* at 147-49. Accord, *Hutchinson v. Stuckey*, 952 F.2d 1418 (D.C. Cir. 1992); *Earl v. Bouchard Transp. Co., Inc.*, 917 F.2d 1320 (2d Cir. 1990); *Matter of Innovative Const. Systems, Inc.*, 793 F.2d 875 (7th Cir. 1986); *Smith v. John Swafford Furn. Co., Inc.*, 614 F.2d 552 (6th Cir. 1980); *Transok Pipeline Co. v. Darks*, 565 F.2d 1150 (10th Cir. 1977). See, also, *Cygnar v. City of Chicago*, 865 F.2d 827, 847-48 (7th Cir. 1989) (stating that while " 'a somewhat more exacting standard of appellate review should apply' "

where trial court grants, rather than denies, new trial on damages, "the trial judge's determination of the propriety of a jury's damage award warrants substantial deference").

The U.S. Court of Appeals for the Fifth Circuit has specifically held that "[t]he trial court in passing on a motion for a new trial need not take the view of the evidence most favorable to the verdict winner, but may weigh the evidence." *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982). See, also, *Silver Sage Partners v. City of Desert Hot Spring*, 251 F.3d 814 (9th Cir. 2001); *Dominium Management v. Nationwide Housing Group*, 195 F.3d 358 (8th Cir. 1999); *Defender Industries v. Northwestern Mut. Life Ins.*, 938 F.2d 502 (4th Cir. 1991). But see *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391 (6th Cir. 1990).

The U.S. Court of Appeals for the Third Circuit has noted that the use of a remittitur "clearly falls within the discretion of the trial judge, whose decision cannot be disturbed . . . absent a manifest abuse of discretion." *Spence v. Bd. of Educ. of Christina School Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986). "The district judge is in the best position to evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion." *Id.* Accord *Delli Santi v. CNA Ins. Companies*, 88 F.3d 192 (3d Cir. 1996). See, also, *Sanford v. Crittenden Memorial Hosp.*, 141 F.3d 882 (8th Cir. 1998); *Worsham v. City of Pasadena*, 881 F.2d 1336 (5th Cir. 1989).

Thus, the clear weight of authority, from this jurisdiction and others, holds that a trial court's ruling on a motion for new trial will not be disturbed absent an abuse of discretion, i.e., where the record reveals no tenable grounds for the ruling. To the extent that *Kehm v. Dumpert*, 183 Neb. 568, 162 N.W.2d 520 (1968), and *Chaloupka v. State*, 176 Neb. 746, 127 N.W.2d 291 (1964), hold otherwise, they are disapproved. Based on the well-established principles and reasoning set forth above, we continue to adhere to the rule that a motion for new trial is addressed to the discretion of the trial court, and the trial court's decision will be upheld unless it is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. See, *Genetti v.*

*Caterpillar, Inc.*, 261 Neb. 98, 621 N.W.2d 529 (2001); *Fine v. Fine*, 261 Neb. 836, 626 N.W.2d 526 (2001).

That having been said, we note that on the trial record made in this case, even on direct appellate review, these verdicts would teeter on the edge of being excessive as a matter of law. But, under an abuse of discretion standard of review, we certainly cannot say that the district court's decision was untenable or indefensible. This is not to imply that a trial judge has unbridled discretion to grant a new trial on a verdict with which he or she disagrees; the judge does not. However, in this case, an experienced trial judge saw and heard the witnesses and determined that the damages awarded were so excessive as to indicate that they were the result of passion or prejudice. The district court clearly explained its reasoning for that conclusion, and that reasoning demonstrates that this should not be classified as a case of a trial judge's mere disagreement with the verdict.

The trial judge found, and the record supports, that Holmes suffered multiple contusions and multiple abrasions as a result of the July 9, 1994, incident, but that Holmes suffered no permanent disability, no future medical expenses, and no inability to work or loss of earning capacity and that Holmes received no medical attention after he went to Immanuel Medical Center on the day of the incident. We do not belittle the harm that Holmes suffered. The record reflects that he experienced a demeaning, humiliating, and anxiety-inducing incident and aftermath. However, there was no medical testimony by a physician or any other health professional regarding Holmes' asserted mental distress. Holmes, in fact, did not miss his scheduled softball game after the July 9 incident.

Thus, after thoroughly reviewing the record (including the evidence of humiliation and mental anguish suffered by Holmes), we cannot say that the district court abused its discretion when the court concluded that the verdicts of $250,000 and $50,000 were not supported by the evidence and did not bear a reasonable relationship to the elements of the damages proved. The trial judge, having seen and heard the witnesses, is in a better position to assess the relationship of the verdicts to the intangible type of damages suffered by Holmes than is this court from a printed record. Holmes' first assignment of error is without merit.

### LIMITATION OF NEW TRIAL TO ISSUE OF DAMAGES

In the district court's order granting a new trial, the only basis identified for the order is excessive damages. The order identifies no error in the jury's determination of liability. Holmes argues that if a new trial is to be had, it should be limited to the issue of damages.

When the issue of liability has been determined and there has been error in the determination of damages such that the verdict must be set aside, a new trial may be limited to the issue of damages. *Omaha Mining Co. v. First Nat. Bank*, 226 Neb. 743, 415 N.W.2d 111 (1987). See, also, *Erftmier v. Eickhoff*, 210 Neb. 726, 316 N.W.2d 754 (1982), *overruled on other grounds, Nielsen v. Adams*, 223 Neb. 262, 388 N.W.2d 840 (1986) (affirming award of new trial but modifying order by limiting new trial to issue of damages).

The district court's order simply states that "the defendants are granted a new trial" on the assault and battery and July 9, 1994, false imprisonment cause of action; the order does not specify whether the new trial is to be limited to the issue of damages. The district court, however, did not find any error in the jury's verdict insofar as the jury found that Holmes had proved liability on the part of the defendants. This court's own review of the record reveals no such error. Consequently, we conclude that the district court abused its discretion in not explicitly limiting the new trial to the issue of damages. Holmes' second assignment of error has merit.

Based on our resolution of Holmes' first assignment of error, we affirm the district court's order of a new trial on Holmes' first two causes of action. However, based on our analysis of Holmes' second assignment of error, we modify the order of the district court and direct that the new trial on these causes of action be limited to the issue of damages. See *Erftmier v. Eickhoff, supra.*

### MALICIOUS PROSECUTION CAUSES OF ACTION

Holmes assigns that the district court erred in directing a verdict against him on his malicious prosecution causes of action. In a malicious prosecution case, the necessary elements for the plaintiff to establish are (1) the commencement or prosecution of the proceeding against him or her; (2) its legal causation by the

present defendant; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage, conforming to legal standards, resulting to the plaintiff. *Prokop v. Hoch*, 258 Neb. 1009, 607 N.W.2d 535 (2000); *Gordon v. Community First State Bank*, 255 Neb. 637, 587 N.W.2d 343 (1998), *cert. denied* 528 U.S. 814, 120 S. Ct. 50, 145 L. Ed. 2d 44 (1999).

■ Although the "prosecutions" at issue in this case were initiated by Omaha police officers, where an informant knowingly gives false or misleading information or otherwise directs or counsels officials in such a way so as to actively persuade and induce the officer's decision, then the informant may still be held liable for malicious prosecution. See *Schmidt v. Richman Gordman, Inc.*, 191 Neb. 345, 215 N.W.2d 105 (1974). It need not be shown that a defendant actively participated in getting the complaint filed or, for that matter, signed the complaint; if the defendant gave information or made complaint to the officers of law in such a manner as that, in the regular and ordinary course of events, a complaint must issue, then this is sufficient to warrant finding the defendant to be the real prosecutor. See *id.*

The district court determined that there had been no evidence presented that Holmes suffered any damages as a result of either the disturbing the peace charge brought as a result of the July 9, 1994, incident or the trespassing charge brought as a result of the January 28, 1995, incident. However, this court rejected a similar argument in *Schmidt v. Richman Gordman, Inc., supra*. In that case, shoplifting charges were brought against two retail customers as a result of the complaint of the retailer. The customers sued the retailer and won a jury verdict, and the retailer on appeal challenged the finding of damages. This court stated:

> When one is unlawfully restrained of his personal liberty, arrested and paraded through a store under guard of a police officer, confined in the local jail for 3½ to 4 hours, fingerprinted and "mugged" for permanent FBI records, charged with a criminal offense, and compelled to retain counsel for their defense, damage is obvious and serious. Mental anguish and distress, humiliation and disgrace are virtually presumed.

*Id.* at 354, 215 N.W.2d at 111.

The evidence of damages resulting from the criminal charges is not as substantial in the instant case. Nonetheless, taking the evidence in the light most favorable to Holmes, as we are required to do, we conclude that there is sufficient evidence of damages contained in the record to submit to a finder of fact. The record supports a reasonable inference that Holmes suffered anxiety from the pending criminal charges in both instances because of the potential effect of a criminal record on his employment. The record also reflects that Holmes was subjected to the inconvenience and possible expense of retaining an attorney and appearing in court on the trespassing charge, although the nature of the disposition of that case is not entirely clear. Based on this evidence, a reasonable jury could conclude that Holmes had suffered damages.

Because the evidence was sufficient to support a finding of damages, the district court erred in directing a verdict on Holmes' malicious prosecution causes of action. The judgment of the district court is reversed in this regard, and the cause is remanded for a new trial on the malicious prosecution causes of action. We do note, however, that the dismissal with respect to Beran is affirmed, and he should not be a party to the new trial as no error relating to his dismissal was properly preserved for appellate review.

### CROSS-APPEAL ON JULY 9, 1994, FALSE IMPRISONMENT

The defendants assign on cross-appeal that the district court erred in not granting them a judgment notwithstanding the verdict on the July 9, 1994, false imprisonment. The defendants argue that even in the light most favorable to Holmes, the evidence shows that Rummel and Leggett had probable cause to detain Holmes following the altercation with O.J. and K.C.

False imprisonment consists in the unlawful restraint against his or her will of an individual's personal liberty. Any intentional conduct that results in the placing of a person in a position where he or she cannot exercise his or her will in going where he or she may lawfully go may constitute false imprisonment. *Dangberg v. Sears, Roebuck & Co.*, 198 Neb. 234, 252 N.W.2d 168 (1977); *Schmidt v. Richman Gordman, Inc.*, 191 Neb. 345, 215 N.W.2d 105 (1974). A security guard, however,

may lawfully arrest and detain any person violating any law of this state or any legal ordinance of any city or incorporated village of this state. See Neb. Rev. Stat. § 29-401 (Reissue 1995).

Taken in the light most favorable to Holmes, the evidence would show that Holmes was assaulted by O.J. and K.C. and acted only to reasonably defend himself. If events occurred as Holmes described them, then Holmes did not violate any law or legal ordinance, and his arrest was unlawful. Assuming Holmes' testimony to be true, as we must, it would be reasonable to infer from the evidence that Rummel and Leggett knew that Holmes had not committed any offense, and nonetheless took him into custody. Moreover, even assuming Holmes' initial detention was lawful, the evidence taken in the light most favorable to Holmes would support the inference that the detention was continued for an unreasonable time, thus giving rise to a cause of action for false imprisonment even if the initial detention was justified. See *Latek v. K Mart Corp.*, 224 Neb. 807, 401 N.W.2d 503 (1987).

The defendants also argue that Holmes was not detained by Rummel and Leggett, but by Sundermeier and Noble, who are not parties to this action. However, the evidence is undisputed that Holmes was first taken into custody and handcuffed by Rummel and Leggett. Further, the evidence establishes that even while other Mall employees may have been involved in the detention, the detention was initiated and maintained based upon the request and statements of Rummel and Leggett, who were the only Mall employees to observe the majority of the incident. One who by affirmative direction, persuasion, or request procures an unlawful arrest and detention of another may be liable for false imprisonment. See *Huskinson v. Vanderheiden*, 197 Neb. 739, 251 N.W.2d 144 (1977).

Taken in the light most favorable to Holmes, the evidence would support a finding of false imprisonment on July 9, 1994. The district court did not err in refusing to enter a judgment notwithstanding the jury's verdict. The defendants' assignment of error on cross-appeal is without merit.

## CONCLUSION

The district court did not abuse its discretion in granting the defendants' motions for new trial on Holmes' first two causes of

action, but did abuse its discretion in not limiting that new trial to the issue of damages. The district court erred in directing verdicts on Holmes' malicious prosecution causes of action, but did not err in refusing to enter a judgment notwithstanding the verdict on Holmes' July 9, 1994, false imprisonment claim. The order of the district court granting a new trial on Holmes' first two causes of action is affirmed, but modified to reflect that the new trial on the first two causes of action shall be limited to the issue of damages. The judgment of the district court is reversed with respect to the malicious prosecution causes of action as set forth in the opinion, but in all other respects, the judgment is affirmed as modified. The cause is remanded for a new trial consistent with this opinion.

AFFIRMED IN PART AS MODIFIED, AND IN PART
REVERSED AND REMANDED FOR A NEW TRIAL.

HENDRY, C.J., dissenting.

Because I disagree with the majority's conclusion that a new trial on damages is warranted in this case, I respectfully dissent.

## STANDARD OF REVIEW

I agree with the majority that an abuse of discretion standard is the proper standard regarding a motion for new trial. However, I disagree with the majority's application of the abuse of discretion standard insofar as the majority asserts that this court must view the facts on appeal in the light most favorable to the trial court's decision. I believe this court's established precedent requires that we view the facts in the light most favorable to the jury's verdict.

Most recently in *McCune v. Neitzel*, 235 Neb. 754, 457 N.W.2d 803 (1990), a case involving a claim for defamation, the trial court granted a new trial on the issue of damages. We stated, "In reviewing the evidence on damages, an appellate court views the evidence in the light most favorable to the prevailing party [at trial], and all controverted facts are resolved in favor of that party." *Id.* at 765, 457 N.W.2d at 811. After construing the evidence of damages in the light most favorable to the jury's verdict, we concluded the trial court abused its discretion in granting a new trial on damages. Compare, *Kehm v.*

*Dumpert*, 183 Neb. 568, 162 N.W.2d 520 (1968); *Chaloupka v. State*, 176 Neb. 746, 127 N.W.2d 291 (1964); *Thomas v. Owens*, 169 Neb. 364, 99 N.W.2d 611 (1959). These cases reflect this court's well-established policy that a jury verdict is not rendered meaningless on appeal by the fact that the trial judge has granted a new trial.

The majority, in asserting this court should view the facts in the light most favorable to the trial court's decision, stresses that the trial court is in a better position than an appellate court to assess the issues related to granting a new trial. This, however, begs the principal question at issue, namely, whether the trial court is in a better position to assess the amount of damages than is the jury. This court has often stated that assessing damages is a function of the jury. See, e.g., *O'Connor v. Kaufman*, 260 Neb. 219, 616 N.W.2d 301 (2000). Furthermore, damages awarded by a jury are accorded particular deference when " '[t]he law does not prescribe a definite rule for the ascertainment of the exact amount recoverable . . . .' " *Jensen v. Barnett*, 178 Neb. 429, 433, 134 N.W.2d 53, 55 (1965). In *Greenberg v. Fireman's Fund Ins. Co.*, 150 Neb. 695, 35 N.W.2d 772 (1949), this court set out the importance of the role of the jury as fact finder. We stated:

> It further is argued that the actions, demeanor, and statements of counsel and witnesses for the defendants were heard and observed by the trial court, and that the trial court had the right to consider those matters in determining the granting or denying of a new trial. The fault with that reasoning is that it is for the *trial jury* to weigh those matters in reaching a verdict. Those considerations are not for the court in exercising its judgment on the motion for a new trial.

(Emphasis supplied.) *Id.* at 705, 35 N.W.2d at 779.

Under the rule set forth by the majority, a motion for new trial becomes a potent method for the losing party to convert, for purposes of appeal, a jury verdict against him or her into a bench trial verdict in his or her favor. The decision to request a jury trial, and the jury's verdict in the prevailing party's favor, would have no effect on our review of the trial court's grant of a new trial. At least two of the jurisdictions relied upon by the majority embrace such a rule. See, *Hutcherson v. City of Phoenix*, 192

Ariz. 51, 961 P.2d 449 (1998); *Wall v. Suits*, 318 S.C. 377, 458 S.E.2d 43 (S.C. App. 1995).

As further support for its position, the majority relies on *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996). The issue before the Supreme Court in *Gasperini* was whether the Reexamination Clause of the Seventh Amendment to the U.S. Constitution, which is applicable only to federal courts, prohibits appellate review of a district court's judgment denying a motion to set aside a verdict as excessive. *Id.* The Court held in *Gasperini* that appellate courts may review such an order, consistent with the Seventh Amendment, so long as an abuse of discretion standard is applied, giving considerable deference to the trial court's decision. However, the U.S. Supreme Court has not addressed a case such as the present one where the court and the jury reach differing conclusions regarding the amount of damages.

In accord with the jury's role as fact finder, several federal courts have agreed that in reviewing a trial court's decision to grant or deny a new trial on excessive damages, the facts must be considered in the light most favorable to the jury's verdict. See, *McNabola v. Chicago Transit Authority*, 10 F.3d 501 (7th Cir. 1993); *Velazquez v. Figueroa-Gomez*, 996 F.2d 425 (1st Cir. 1993); *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680 (2d Cir. 1993).

The rationale for such a rule is set out in *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1047 (6th Cir. 1996), where the court stated:

> [I]n reviewing a trial court's decision [granting a new trial] we must closely scrutinize the trial court's justifications in order to protect the litigant's right to a jury trial. . . .
>
> ". . . [T]he trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts."

In addition, as noted by this court, "The public does not maintain the courts and the expense of jury trials for experimental

investigations, but rather to determine controversies." *Greenberg*, 150 Neb. at 702, 35 N.W.2d at 777.

Giving deference to the trial court's decision to grant a new trial under an abuse of discretion standard is not "inconsistent" with viewing the facts on appeal in the light most favorable to the jury's verdict. Under *McCune v. Neitzel*, 235 Neb. 754, 457 N.W.2d 803 (1990), I believe the proper inquiry concerning an appeal from a motion for new trial based on excessive damages is a three-step process which both recognizes the unique place of the jury as fact finder and affirms the trial court's decision unless it is supported by "no tenable grounds."

In the first step of the process, we review the evidence presented at trial regarding damages in the light most favorable to the jury's verdict. See *McCune, supra.* Second, we consider the grounds set forth by the trial court in its order supporting the conclusion that the damages were excessive, recognizing that the trial court was present and heard the witnesses and testimony. See *id.* In the final step of the process, we consider whether given the evidence, the amount of damages awarded, and the grounds upon which the trial court granted a new trial, the trial court abused its discretion in granting a new trial. *Id.* During this final consideration, we will affirm the trial court's decision unless no tenable grounds exist to support its decision. See *Kumar v. Douglas County*, 234 Neb. 511, 452 N.W.2d 21 (1990). Accordingly, in my opinion, the *McCune* standard of review accommodates both the jury's role as fact finder and the deference due to the trial court's decision granting a new trial.

I do not believe the rule set out by the majority is in accord with this court's established jurisprudence regarding a motion granting or denying a new trial based on excessive damages. See, e.g., *McCune, supra*; *Vacek v. Ames*, 221 Neb. 333, 377 N.W.2d 86 (1985); *Paddack v. Patrick*, 163 Neb. 355, 79 N.W.2d 701 (1956); *Shiers v. Cowgill*, 157 Neb. 265, 59 N.W.2d 407 (1953). I am of the view that *McCune* properly stated this court's standard of review and should be followed in this case.

## GRANT OF NEW TRIAL

Under *McCune, supra*, I believe the trial court abused its discretion in granting a new trial on Holmes' assault and battery and false imprisonment claims.

Regarding Holmes' assault and battery claim, the measure of recovery in such a case encompasses " 'the nature of the injuries, and pain and suffering,' " see *Nelson-Holst v. Iverson*, 239 Neb. 911, 915, 479 N.W.2d 759, 762 (1992), including "the emotional distress and anguish caused by a humiliating assault and battery," see *Duncza v. Gottschalk*, 218 Neb. 879, 881, 359 N.W.2d 813, 815 (1984). Furthermore, damages for pain and suffering are "intangible and quite subjective elements" which are not "a mere matter of computation." *Duncza*, 218 Neb. at 880, 359 N.W.2d at 814.

The evidence in the present case, viewed in the light most favorable to the jury's verdict, shows that during the assault and battery, Holmes suffered significant mental and emotional distress in addition to his physical injuries. After Holmes' altercation with O.J. and K.C., he described the incident with the security guards:

> Officer Ted Reynolds runs to the door, pushed the door open. He runs up and says, what is going on? What is going on? [K.C.] said to him, he hit me. . . . Officer Reynolds didn't give me a chance to say anything. He runs over to me, from that chair to there, 15 feet, runs to me and pushed me dead in my chest, boom! You like to fight with little girls? Fight me. I said, hey, hold it. I'm telling you what is going on. Boom! he pushed me again, and he repeated the exact same thing.
>
> . . . I put my hands to my side - to my waist just like this (indicating). I kept my hands to my side . . . I figured he's still out of control. I turned my back on him. I turned around on him. That's when he attacked me, when my back was turned. What he did was he went up there and took his right arm and threw it up to my neck, pulled me back and we bumped heads, pushed my jugular vein down my throat almost and screaming, get down, get down, get down. . . . He really put the pressure on and I couldn't get myself together.
>
> When I saw lights, I saw flashing lights, I was getting ready to go. So what I did, I took my left hand, which was free, and grabbed his wrist, pulled it off my Adam's apple
> . . . .

. . . .

Then [Leggett] comes out there . . . and they were trying to get me down. And I was telling them, Man, you are making a mistake. And he goes whop! right in my side, right there (indicating) and knocked the wind right out of me. I said, oh, man. Then he said, get down, get down. I thought I better get down or these guys are going to kill me . . . .

Holmes also gave the following description of the events which occurred after he was on the ground:

The next thing I look up and my head is over the curb, over the curb. I'm trying to tell these Security [officers] that they made a big mistake. I'm the one that got attacked. I'm the one that got attacked, and they didn't want to hear it. . . . He grabbed my head - he grabbed my head and put his knee on my head . . . . When I said, you made a mistake, he applied more pressure.

Then I looked up the street and here come the [security] Jeep coming down there. My head is laying out in the street and the Jeep come flying down there and they said, get him up, get him up. I thought the Jeep was going to hit my head. I mean, they just lost complete control. . . .

. . . Especially when he had his wrist or part of his hand on my Adam's apple because of the way I had him to keep him off, it was like a — I don't know what he was trying to put me into, but it didn't work. I had to get myself out of it. If I didn't do what I did, I don't think I would be here talking to you today. That's how close it is.

You know, when somebody pushes your Adam's apple in, believe me, that is an experience you don't want to go through.

Holmes also testified he knew that O.J. and K.C., as well as a large crowd of people coming and going from the Mall, watched as the security officers subdued and handcuffed him, placed him in a security car, and drove him to the security office. Holmes testified, "There was a lot of people there and saw what was going on. A lot of people was there."

Applying the first step of the standard in *McCune v. Neitzel*, 235 Neb. 754, 457 N.W.2d 803 (1990), I would construe the facts as follows: (1) Holmes was attacked, subdued, and handcuffed

by the security officers; (2) Holmes suffered injuries to his knees and shoulder which left scars; (3) the incident occurred in front of a large crowd; (4) Holmes was placed in fear of his life during the incident; (5) Holmes suffered shame and humiliation during the incident; and (6) Holmes was seen later that day by emergency room personnel.

Next, under the second step in the process, I would consider the trial court's grounds for concluding the verdict was excessive. The trial court here found the damages awarded on the assault and battery claim were "clearly exorbitant" in that the damages "do not bear a reasonable relationship to the elements of damages proved." In support of this conclusion, the court specifically found that Holmes' "injuries were not life threatening" and that Holmes "played softball after the July 9, 1994, incident, although he apparently sat on the bench." The court also found "[n]o medical bills were offered or received in evidence, nor was there a stipulation regarding medical bills." Furthermore, "[t]here was no medical testimony by a doctor or any other health professional" regarding Holmes' injuries. The court found "[t]here is absolutely no evidence of any permanent injury," "permanent disability," "future medical expenses," "inability to work," or "loss of earning capacity." Finally, the court noted that Holmes received "no medical attention after he went to Immanuel Medical Center."

The court in its order focuses on the fact that Holmes' injuries were relatively minor and that the incident did not physically incapacitate Holmes to any significant degree. However, as discussed previously, Holmes is also entitled to recover for the mental and emotional distress, shame, humiliation, and fright that he suffered during the incident. The fact that Holmes' injuries were relatively minor, standing alone, does not provide tenable grounds for concluding that the verdict on the assault and battery claim was excessive.

We have noted previously that a court should be very reluctant to substitute its judgment for that of a jury " '[w]here recovery is to be had for such subjective elements as the mental anguish caused by a humiliating beating, and the pain and suffering resulting therefrom . . . .' " *Crouter v. Rogers*, 193 Neb. 497, 498, 227 N.W.2d 845, 847 (1975). See, also, *Stewart v. Ritz Cab Co.*, 185 Neb. 692, 178 N.W.2d 577 (1970). Even in a situation in

which the reviewing court might " 'determine that a lesser amount would constitute adequate compensation for the injuries sustained,' " the court " 'may not substitute its judgment for that of the jury' " so long as the jury could properly arrive at the amount determined. *Husak v. Omaha National Bank*, 165 Neb. 537, 544, 86 N.W.2d 604, 608 (1957).

When considered as a whole, the evidence shows that Holmes suffered humiliation in front of a large crowd. Holmes also suffered emotional and mental distress as a result of being subdued, dragged, and handcuffed. Holmes believed the officers were out of control. The officers did not listen to Holmes' explanations. Holmes feared for his life at two different points during the incident. Given the evidence in the record, I find no tenable grounds for the trial court's conclusion that the jury's award of $250,000 for Holmes' assault and battery claim was motivated by passion or prejudice. Therefore, I believe the trial court abused its discretion in granting a new trial on the assault and battery claim.

Regarding Holmes' false imprisonment claim, he is entitled to recover damages for the physical discomfort and mental distress caused by the unlawful act. *Huskinson v. Vanderheiden*, 197 Neb. 739, 251 N.W.2d 144 (1977). "In awarding damages for physical discomfort and mental anguish a jury must rely on the totality of the circumstances surrounding the incident, the credibility of the evidence and witnesses, and the weight to be given to all these factors rests in the sound discretion of the jury." *Id.* at 745, 251 N.W.2d 148. See, also, *Herbrick v. Samardick & Co.*, 169 Neb. 833, 101 N.W.2d 488 (1960).

Construing the facts in the light most favorable to the jury's verdict, the evidence shows that Holmes was unlawfully detained for approximately 45 to 60 minutes and that for most of that time, he remained handcuffed and was bleeding from his injuries. He was offered no care for his injuries, except a tissue to wipe the blood. Holmes also testified that during his detention:

> They gave me two - two choices. They said while I was in handcuffs and everything, we want you to sign the paper [banning him from the mall for 1 year because of fighting], and I said, no, I'm not going to sign any papers. And they said, well, if you don't sign the papers, you will stay here or you will go downtown. And that was my ultimatum.

. . . .

. . . [H]e presented this paper to me and said you have to sign this. I said, for what? He said, for fighting. I said, no, huh-uh, you're wrong. So we was going back and forth, back and forth, back and forth for a long time. And then he said, okay, you've got a choice. I said, what is the choice? I'm still in handcuffs at the same time. I'm still handcuffed. He said, you got a choice. Either sign this paper or you go downtown for criminal charges.

Holmes further testified that he refused to sign the form for about 35 minutes, but finally agreed to sign it. Holmes stated, "I had no choice. I didn't want to go downtown." Holmes was concerned about possible criminal prosecution because his job with the Omaha Public Schools required him to keep his record "clean."

Regarding the false imprisonment claim, the trial court found in its order that "the plaintiff was in the security office for 45 to 60 minutes, and . . . was bleeding the whole time." The trial court made no other findings in its order as to why the award of $50,000 was not reasonably related to the evidence of damages.

Our remarks in *Bishop v. Bockoven, Inc.*, 199 Neb. 613, 617-18, 260 N.W.2d 488, 491 (1977), regarding a claim for false imprisonment, are applicable in the present case:

There is evidence of embarrassment and mental anguish in this case, and there is no accurate method or formula by which such damage can be measured and determined. In awarding damages for physical discomfort and mental anguish, the fact finder must rely on the totality of the circumstances surrounding the incident, [and] the credibility of the evidence and witnesses . . . .

I believe the evidence, when viewed in the light most favorable to the jury's verdict, provides no tenable grounds for the trial court to conclude that the jury's award of $50,000 for Holmes' false imprisonment claim was motivated by passion or prejudice. Accordingly, in my opinion, the trial court further abused its discretion in granting a new trial on Holmes' false imprisonment claim.

For the reasons set forth above, I respectfully dissent.

McCORMACK, J., joins in this dissent.