C. GOODRICH, INC., APPELLEE, v. JOHN F. "JACK" THIES, APPELLEE, AND TAS TRUCK LINES, INC., APPELLANT.

705 N.W.2d 451

Filed November 8, 2005.   No. A-04-502.

Robert J. Becker, of Stalnaker, Becker & Buresh, P.C., for appellant.

Frederick S. Cassman, of Abrahams, Kaslow & Cassman, L.L.P., and Craig D. Wittstruck and Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., for appellee C. Goodrich, Inc.

SIEVERS, MOORE, and CASSEL, Judges.

CASSEL, Judge.

## INTRODUCTION

TAS Truck Lines, Inc. (TAS), appeals from a judgment, entered following a retrial to the bench, which awarded

$225,000 to C. Goodrich, Inc. (CGI), as damages resulting from a breach of contract. The primary question on appeal is whether specific findings made by the trial court in connection with TAS' motion for new trial supplant the trial court's initial general finding. Because we conclude that they do and that the monetary judgment for CGI was based solely upon a clearly erroneous factual finding, we reverse the monetary judgment for CGI but otherwise affirm the judgment rejecting the parties' other contentions.

## PROCEDURAL BACKGROUND

CGI's operative petition against TAS alleged two causes of action, the first of which was subsequently dismissed. The second cause of action alleged that TAS breached the contract between the parties by failing to make payments due on CGI's trucks and trailers and by failing to pay compensation to CGI's employees. TAS denied the allegations and filed a counterclaim alleging that CGI breached the contract by failing to turn over accounts receivable payments to TAS, by refusing to sell CGI's trucks and trailers for payoffs, and by failing to remain with TAS for 5 years.

Following a jury trial, the jury returned a verdict finding in favor of CGI and awarding CGI damages of $225,000. The jury also returned a verdict in favor of TAS on its counterclaim and awarded damages of $13,600 to TAS. TAS appealed, and CGI filed a cross-appeal. After determining that a supplemental jury instruction given by the trial court was erroneous, this court set aside the jury's verdicts and remanded the cause for a new trial. See *C. Goodrich, Inc. v. Thies*, No. A-01-765, 2003 WL 105215 (Neb. App. Jan. 14, 2003) (not designated for permanent publication).

Further proceedings commenced at the trial court level on November 24, 2003. The parties stipulated that retrial would be to the bench, and the trial court received into evidence the bill of exceptions and exhibits from the first trial, along with the deposition of an agent for West Bay Leasing Services, L.L.C. (West Bay Leasing), and CGI's answers to TAS' first set of interrogatories.

## FACTUAL BACKGROUND

CGI, owned by Clint Goodrich and Ruth Goodrich, is a trucking company incorporated in Minnesota that hauls goods for customers. In 1997, CGI operated eight trucks and nine trailers. TAS, owned by John F. "Jack" Thies and his wife, is a trucking company incorporated in Nebraska that also hauls goods for customers. On October 28, 1997, CGI and TAS entered into a written agreement to combine the companies and form a new corporation to conduct trucking business. The consolidation was to occur on January 1, 1998. However, problems arose before that time.

To pay for fuel, CGI's drivers used fuel credit cards issued by a third party, and the third-party issuer would debit CGI's account at CGI's bank in Winnebago, Minnesota. On November 4 and 5, 1997, CGI's bank refused to honor the debits on CGI's account due to insufficient funds in the account. After being informed of the situation, TAS paid the third-party issuer $3,500 on November 6, representing CGI's fuel charges from October 30 to November 5. From that point on, CGI's drivers used fuel credit cards issued to TAS.

On November 7, 1997, Thies and Clint negotiated a new agreement due to an "emergency need" to get the trucks moving. That handwritten agreement, signed by Thies and Clint, states:

> TAS agrees to:
> • Take over CGI trucks & trailers for payoffs
> • Work on a bonus plan & allow Clint to earn or buy stock options in TAS as TAS performance improves.
> • Pay Clint & Ruth compensation of $90,000/year total cost to TAS. (including taxes, ins[urance] etc)
> • Buy/payoff the accounts Rec[eivable] from the bank
> Goodrich agrees to:
> • Sell trucks & trailers for payoffs
> • Forward acc[ounts] Rec[eivable] checks to TAS as they come in
> • Stick with TAS for a minimum of 5 years

At the time of the November 7, 1997, agreement, all of CGI's trucks and trailers were under lease agreements, with the exception of one tractor secured by a lien and one trailer secured by a

lien at CGI's bank. TAS paid off CGI's lien for that trailer on November 7. Also on November 7, TAS paid $75,017.49 to CGI's bank in payment of CGI's accounts receivable. There is no dispute that TAS bought or paid off the accounts receivable from CGI's bank.

With regard to the bonus plan component of the agreement, Clint testified that there was no work on a bonus plan to allow him to earn or buy stock options in TAS. Thies testified that implementation of the bonus plan was not expected to happen for a few months or until TAS and CGI got everything running together. Clint admitted that he would not expect a bonus plan to be implemented 2½ months after the agreement went into effect.

According to the evidence, CGI's obligation to forward accounts receivable checks to TAS became related to TAS' obligation to pay compensation to CGI. Under the contract, CGI was to forward the accounts receivable checks to TAS. In November, CGI remitted to TAS two checks totaling $29,569.17—one in the amount of $18,003.40 with "Factoring note" written on the memo line and the other in the amount of $11,565.77 with "Acc rec." written on the memo line. Although CGI received $59,370.10 in accounts receivable collections, no other accounts receivable payments were made to TAS. Clint testified that he forwarded the accounts receivable checks to TAS until Thies told Clint not to do so. At some point, Clint approached Thies about the compensation of $7,500 per month or $90,000 per year and the parties agreed to allow CGI to retain a portion of the accounts receivable in lieu of, or as payment of, the salary. Ruth testified that she and Clint retained $22,500 of the accounts receivable collections as salary for 2 weeks in October and all of November and December 1997 and for January 1998. As to the extent that the compensation was being offset by accounts receivable, Clint was asked if TAS performed the compensation component of the contract, and he answered, "Yes. I guess, technically, in a round about way, you could look at it that way." CGI retained an additional $7,393 in accounts receivable collections and used that money to make truck payments.

Clint testified that TAS failed to take over CGI trucks and trailers for payoffs. On December 8, 1997, Thies wrote a letter to West Bay Leasing requesting a list of payments left on CGI's

equipment and the payoff figures. West Bay Leasing provided the payoff figures on December 10. West Bay Leasing provided amortization schedules for certain leases in correspondence dated December 22, 1997, and it provided more lease payoff information on some of the equipment on January 5, 1998. Thies inquired what the interest rate would be if he turned the lease into a common loan, and West Bay Leasing responded on January 15 with a possible method of refinancing the debt on the equipment. Thies also obtained temporary licensing for the trucks and trailers to be effective January through March 2, 1998. Clint testified that he was not aware that Thies and West Bay Leasing were engaged in negotiations in January 1998 regarding payoffs.

With regard to lease payments, Clint testified that he received telephone calls from West Bay Leasing, Associates Commercial Corporation, and Farm Credit Leasing that the payments were not being made for the month of November 1997. Clint spoke with Thies about it, and payments were then made. In December, payments had again not been made and insurance was lapsing. Clint spoke with Thies, and TAS made the payments, although not timely. Clint again received telephone calls regarding payments in January 1998. When Clint spoke with Thies, Thies said the November 7, 1997, contract needed to be renegotiated. Clint admitted that the November 7 contract did not require TAS to make lease payments for CGI. Further, TAS paid some bills for repairs of CGI equipment in December 1997 and January 1998. On November 17, 1997, the insurance company asked for an insurance payment, which TAS made. Confronted with evidence of this payment, Clint admitted that he was wrong when he said that TAS had not paid anything. In January 1998, TAS paid for the insurance on CGI's trucks until February 1. TAS also had licenses for CGI equipment issued in the name of "TAS Truck Lines." Thies testified that TAS would not have insured and licensed CGI equipment if TAS was not going to pay "them" off.

No lease payments for January 1998 were made by TAS. Thies testified that TAS did not make the January lease payments because (1) TAS was working on getting specific payoff amounts for CGI's trucks and trailers, (2) Clint left the company in January 1998, and (3) Clint took control of the trucks. Thies testified that while he was waiting to get a third quote related to

the payoff amounts, Clint "took" the trucks and transferred calls so that when the drivers called, the call would ring at Clint's house. Thus, TAS did not have the ability to call the drivers of those trucks.

The parties attempted to negotiate a new agreement in January 1998. Clint testified Thies told him that CGI was not worth $90,000 because "there's only half of a company," that the trucks were not worth the amount owed against them, and that they needed to renegotiate. Thies denied having any conversations with Clint wherein Thies indicated that TAS was not going to pay the $90,000 or that $90,000 was too high. Thies also denied having a discussion with Clint wherein Thies indicated that TAS would not make any further lease payments or other payments in regard to CGI trucks unless the November 7, 1997, contract was renegotiated. A document on CGI's letterhead submitted to TAS on January 19, 1998, contains suggestions and negotiations by CGI to change the November 7, 1997, agreement.

Ultimately, the remaining trucks and trailers were either sold by Clint and Ruth for more than the payoff amounts, retained by them for their own use, or leased to other companies. Between February 24 and December 10, 1998, 9 of the 13 pieces of equipment leased from West Bay Leasing were sold, and CGI received $924 more than the payoff amounts. CGI kept the other four pieces of equipment.

CGI did not remain with TAS for a minimum of 5 years. Clint "walked out" on January 25, 1998. Ruth testified that while she remained in the Minnesota office, she prepared invoices on loads carried on CGI's trucks and billed by TAS. She spoke with Thies several times a day, and Thies requested that Ruth do various tasks on behalf of TAS. The Minnesota home of Clint and Ruth was sold in December 1998, and Ruth moved to Beatrice in mid-December. She began work as the office manager in Beatrice on or about December 26. After a couple of days, for reasons in dispute, Thies asked Clint to tell Ruth not to return to work. Thies testified that Ruth was not an important part of the November 7, 1997, contract. However, Clint was to replace Thies' former manager who earned $90,000 per year. Thies testified that TAS entered into the agreement with CGI because of Clint and the ability to get Clint to manage the TAS operations.

In addition to all the evidence from the original trial, the court also received into evidence CGI's answers to TAS' interrogatories. One of the interrogatories asked CGI to identify each item of damage claimed. CGI listed dollar amounts for (1) insurance, deposit and 3 months' premiums; (2) payoff of equipment for Yellow Medicine County Bank and Minnstar Bank; (3) payoff for Associates Commercial Corporation; (4) payoff for Farm Credit Leasing; (5) loss of profits for 1998; and (6) loss of value of the business.

The court made a general finding for CGI and entered a judgment in favor of CGI in the amount of $225,000 plus the costs of the action. That judgment also dismissed TAS' counterclaim. TAS timely moved for a new trial, and during the hearing on that motion, the court stated:

> There's one thing that I regret here on my part in reviewing this. I just want to say I did not make specific findings in my order, which I normally do. So I understand it's difficult to know the basis of the decision. I did not simply adopt the jury verdict although it's fairly close to that. But I do want to state for the record I felt there was substantial compliance by both [CGI] and [TAS] with respect to the lease issues on the contract between the parties. And my judgment was based on the compensation issue as it pertained to [Ruth]. That basically, she had been — had been let go, I think, in violation of the portion of the agreement to have her provide services, and that was a breach of contract on the part of [TAS]. So I awarded damages on that basis, basically, $45,000 for five years.

The court's order on the motion for new trial stated in part:

> Part of the agreement between the parties was that [TAS] would pay [CGI] $90,000 per year for five years for the services of Clint . . . and Ruth . . . . TAS terminated the services of Ruth . . . without good cause, in violation of the agreement. Clint . . . left TAS' employment, which excused TAS from performing the portion of the agreement related to his services. TAS authorized CGI to retain certain accounts receivable, and there was substantial performance by both parties with respect to the accounts receivable and the leases. However, TAS remained obligated to compensate

CGI for [Ruth's] services, and TAS defaulted in that obligation resulting in damages of $45,000 per year for five years. Accordingly, the motion for new trial should be overruled.

TAS timely appeals.

## ASSIGNMENTS OF ERROR

TAS alleges that the trial court erred in overruling its motion for new trial by finding (1) that TAS materially breached the contract as it pertained to the compensation component of the contract; (2) that CGI should be awarded $225,000 in damages when that award was not sustained by the evidence, was contrary to law, was beyond the claims of CGI, and was excessive; and (3) that CGI did not materially breach the contract.

## STANDARD OF REVIEW

A suit for damages arising from breach of a contract presents an action at law. *Par 3, Inc. v. Livingston*, 268 Neb. 636, 686 N.W.2d 369 (2004). In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Id.* The appellate court does not reweigh the evidence but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Phipps v. Skyview Farms*, 259 Neb. 492, 610 N.W.2d 723 (2000). The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Id.*

A motion for new trial is addressed to the discretion of the trial court, and the trial court's decision will be upheld unless it is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. See *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 629 N.W.2d 511 (2001). A motion for new trial is to be granted only when error prejudicial to the rights of the unsuccessful party has occurred. *Hausman v. Cowen*, 257 Neb. 852, 601 N.W.2d 547 (1999).

## ANALYSIS

■ Because neither party requested that the district court submit written findings of fact or conclusions of law pursuant to Neb. Rev. Stat. § 25-1127 (Reissue 1995), this case presents an interesting question: Do the unsolicited, specific findings recited by the trial court during the hearing on TAS' motion for new trial, and written by the court in the order denying that motion, supplant the general finding made in the initial judgment? Under the circumstances presented here, we conclude that they do. After the retrial to the bench, the trial court initially entered a judgment for CGI based upon only a general finding. In the subsequent hearing and ruling on the motion, the court did not expressly state that it intended to modify its general verdict. The court did state, however, that it regretted not making specific findings in the initial judgment; that it understood the difficulty in knowing the basis of the court's decision; that it wanted "to state for the record" that CGI and TAS substantially complied, "with respect to the lease issues on the contract"; but that the court's judgment was "based on the compensation issue as it pertained to [Ruth]." The court stated that it "awarded damages on that basis, basically, $45,000 for five years." Under these circumstances, we conclude that the specific findings operated, in effect, to modify the initial judgment and to supplant the general finding. We make this determination only in the context of a bench trial and specific findings, made before the judgment became final, by the same trial judge who made the initial general finding.

The relevant provision of the contract states, "Pay Clint & Ruth compensation of $90,000/year." At trial, Thies explained that it had been negotiated that TAS would pay CGI rather than Clint and Ruth because CGI had a "normal operating loss . . . carried forward of $90,000 on their income taxes. So they could offset $90,000 worth of income without paying any taxes, income taxes." According to Thies, Ruth was not an important part of the agreement and Clint was replacing Thies' previous manager who earned $90,000 per year. Thies testified that the obligation to pay the $90,000 per year ran to CGI. Because we are required to view the evidence in the light most favorable to CGI, this testimony, standing alone, would be insufficient to

disturb the judgment. However, at trial, counsel for the parties agreed that the obligation was to CGI, not to Clint or Ruth individually, as evidenced in the following exchange which took place during Clint's testimony:

[Counsel for CGI]: Okay. And let me back up to the list again. It says, "Pay Clint and Ruth compensation of $90,000 a year." When did you first receive or your wife first receive compensation from TAS?

[Clint]: We didn't.

[Counsel for TAS]: Objection, Your Honor. This is where we were before. I think the parties agree here that the agreement was that TAS would pay [CGI]; am I correct on that, [counsel for CGI]?

[Counsel for CGI]: Yeah.

[Counsel for TAS]: So it's not a matter of his wife's salary or his salary.

[Counsel for CGI]: No.

[Counsel for TAS]: That's where I'm getting confused.

THE COURT: I see. I'll sustain it and ask counsel to restate the question.

■ An attorney has power to bind his or her client by the attorney's agreement in respect to any proceeding within the scope of the attorney's proper duties and powers. Neb. Rev. Stat. § 7-107 (Reissue 1997). See, also, *In re Estate of Mithofer*, 243 Neb. 722, 502 N.W.2d 454 (1993) (stipulations voluntarily entered into between parties' attorneys during trial will be re-spected and enforced); *McCann v. McLennan*, 3 Neb. 25 (1873) (agreement by attorneys made in open court and entered on record binds parties). The stipulation made between the parties' attorneys during trial, that the parties' agreement was that TAS would pay CGI and that it was not a matter of Clint's salary or Ruth's salary, was binding upon the trial court.

The evidence also shows there had been an agreement between the parties for CGI to keep portions of the accounts receivable as payment of compensation rather than turning that money over to TAS as originally set forth under the contract. CGI had collected $59,370.10 in accounts receivable, but turned over only $29,569.17 to TAS. According to the testimony, CGI retained $22,500 as payment for compensation at $7,500 per

month, and also retained an additional $7,393 which was used to make truck payments. Because CGI had retained $22,500 of accounts receivable collections as its compensation for 3 months, there had been no breach of the compensation component of the contract at the time that Clint quit. We conclude that the trial court was clearly wrong in finding that TAS defaulted on its obligation and in awarding damages of $45,000 per year for 5 years as Ruth's compensation under the contract.

We are mindful of the fact that the court initially made a general finding and of the proposition that where neither party requests that the trial court make specific findings of fact and conclusions of law, if there is a conflict in the evidence, the appellate court in reviewing the judgment rendered will presume that the controverted facts were decided in favor of the successful party, and the findings will not be disturbed unless clearly wrong. See *Foiles v. Midwest Street Rod Assn. of Omaha*, 254 Neb. 552, 578 N.W.2d 418 (1998). In *Wagner v. State*, 176 Neb. 589, 595, 126 N.W.2d 853, 857 (1964), *overruled on other grounds, Bentz v. Nebraska P.P. Dist.*, 211 Neb. 844, 320 N.W.2d 763 (1982), a case wherein the jury returned a general verdict and also special findings pursuant to the court's instructions, the Nebraska Supreme Court stated: "[T]o argue that the general verdict is acceptable, therefore the special findings are proper or faultless, is neither legal nor logical. A general verdict cannot rectify improper or erroneous special findings." Just as it is not error to set aside the general verdict if the special findings of a jury are not supported by the evidence, we think it is proper to set aside the general finding if the court's articulated reasons for entering the finding are not supported by the evidence. To conclude that this court must turn a blind eye to the trial court's clearly erroneous finding upon which it admittedly based its decision, because the trial court was not required to make such finding or because such finding was made upon a motion for new trial, would be prejudicial to the rights of TAS and deprive TAS of a just result.

The trial court's specific findings make it clear that the judgment in favor of CGI for $225,000 was based solely upon the finding which we have determined was clearly erroneous. At trial, the parties presented numerous other contentions to the

trial court. In its specific findings, the trial court clearly rejected those other contentions. As to those other issues, we cannot find that the trial court was clearly wrong.

## CONCLUSION

The portion of the judgment granting a monetary judgment to CGI, based upon a clearly erroneous finding, is reversed. The portion of the judgment rejecting the other contentions of the parties is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED.